**FRED A. ARNOLD, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 578–86 C.

United States Claims Court.

Aug. 15, 1989.

James W. Booth, for plaintiff.

Mark A. Melnick, with whom were Asst. Atty. Gen. John R. Bolton, and Director David M. Cohen, for defendant.

## OPINION

WIESE, Judge.

### I

At issue in this case is the finality, under Wunderlich Act standards, 41 U.S.C. §§ 321–322 (1982), of a decision of the Armed Services Board of Contract Appeals denying claims of both contracting parties: Arnold's demand for equitable adjustments in contract price and time based on various claims of Government-caused delay, disruption, and extra work, and the Government's demand for liquidated damages based on a 13–month delay in the completion of construction.[1]

---

1. The decision in question is *Fred A. Arnold,* 86–1 B.C.A. (CCH) ¶ 18,701. The claims in issue

On the basis of the parties' briefs and the oral argument, the court concludes that, with respect to the contractor's claims, the Board's decision is neither erroneous in fact nor law and hence is entitled to finality. However, as to the Government's claim, the court concludes that the denial of liquidated damages was incorrect as a matter of law; hence we reverse.

## II

The contract claims in question grew out of the performance of a competitively-bid construction contract which the United States Navy awarded to Fred A. Arnold, Inc., a small business building company, on May 21, 1975. The contract called for construction of a three-story, 300 foot-long reinforced concrete bachelor enlisted quarters ("BEQ") at Camp Pendleton, California. The contract price was $1.9 million. Work was to begin on June 17, 1975 and the completion date, as adjusted during performance of the work, was set for October 18, 1976. Though construction was timely accomplished, the building's balconies required substantial structural modification (liability for which is one of the issues raised here) that delayed the Government's use and occupancy of the building for approximately 13 months beyond the planned finish date.

In the course of the work various claims arose which, despite efforts to resolve them at the contracting officer level, eventually came before the Board for resolution. Following three weeks of trial, the Board issued a comprehensive decision rejecting virtually all of the contractor's claims (there were 10 claims consolidated under 8 appeal dockets). Also denied by the Board was a Government demand for liquidated damages. Upon rejection of its claims, the contractor brought suit in this court to reverse the Board's decision. The appeal covers all of the claims originally raised before the Board except the "Hollow Metal Doors and Window Frames" claim. The Government, in turn, has filed a counterclaim reasserting its demand for liquidated damages.

## III

■ Before turning to the specific claims in issue, we deal first with a contention which the contractor raises concerning a claimed lack of impartiality on the part of the Board member to whom the trial and decision of this case had been assigned. The contention is that immediately prior to assuming his judicial duties with the Board, the member in question had served as assistant general counsel in the same Navy office charged with the responsibility of defending the Government's interests in this litigation before the Board. It is claimed that the first of the contractor's claims (the "Catch Basins" claim) arose during the Board member's tenure as assistant general counsel and that "more than eight months before [the board member] left the Navy General Counsel's office, either he or persons working with him or under his supervision were actively involved in resisting the Plaintiff's claims which were already before the ASBCA...." Based on these allegations of conflict of interest and the infraction of ethical standards they point to, it is urged that we proceed in our review of the Board's decision uninhibited by the deference otherwise due administrative factual determinations under the Wunderlich Act, 41 U.S.C. § 321.

Despite their seeming seriousness, we give these contentions short shrift. There is absolutely no proof of the contractor's contentions—they are no more than rash speculation. Nor are we given any explanation as to why these contentions were not raised in the proceedings below, as well they might have been. It is no answer to say that the bias was not confirmed until the decision was issued. This was, after all, a panel decision; hence the interests of the concurring Board members in the integrity of their action would certainly have

were litigated before the contract appeals board under the disputes procedures in force prior to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982); hence, review of the administrative decision lies in this court under 28 U.S.C. § 1491(a)(1) (1982) rather than in the United States Court of Appeals for the Federal Circuit under 28 U.S.C. § 1295(c) (1982).

counseled a request for reconsideration before bringing the matter to this court's attention. Finally, and most importantly, based on our review of the conduct of the trial proceedings, and the substantiality of the evidence on which the Board based its findings, we can discern no ground for saying that the decision in question was the product of other than careful judgment, fairly and honestly applied.

This, then, is not a case where the evidence suggests that the Board member had "the kind and degree of personal involvement in the case and hostility to the plaintiff that would warrant disqualification of a judge for bias and prejudice." *Gulf & Western Industries, Inc. v. United States*, 230 Ct.Cl. 1, 7, 671 F.2d 1322, 1326 (1982). Accordingly, the case presents no occasion for departing from the substantial evidence standard in the evaluation of the Board's factual determinations. That standard directs a reviewing court to accept as final factual determinations drawn from "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Company v. National Labor Relations Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). We proceed on that basis.

### Global Settlement Claim

On December 7, 1976, (a date by which all construction except balcony repair had been completed), plaintiff's president met with the contracting officer to discuss the contractor's pending claims. Both parties were represented by counsel. After unsuccessfully attempting to resolve each claim separately, the parties agreed to a "bottom line" settlement of all but four of the contractor's claims. By the terms of this "global" settlement, the Government agreed to pay the contractor an additional $30,000 and to extend the contract completion date by 22 days (from September 26, 1976 to October 18, 1976) in exchange for the release of all of the contractor's claims, except those relating to the catch basins, the pilings, the balcony correction, and the door and window frames. The Government also promised to provide security for the construction site; to relieve the contractor

from having to provide a construction quality control (CQC) representative during the balcony corrective work; to release all previously withheld liquidated damages; and to suspend any further withholding of liquidated damages pending completion of the balcony corrective work and a determination of liability for that work.

As a follow-up to the December 7 meeting, the parties' attorneys met again on December 9 to draft a contract modification formalizing the terms of the settlement previously agreed to. Thereafter, by letter to the Government dated December 16, 1976, the contractor's attorney confirmed the contractor's understanding and acceptance of the global settlement. In turn, the Government forwarded a signed modification to the contractor, Modification No. P00010, which incorporated the global settlement into the construction contract.

The Board held that this settlement and the fulfillment of its terms by the Government constituted an accord and satisfaction thus barring all claims except those specifically excluded from the agreement. In the argument now before us, the contractor concedes that an accord was reached, but challenges the Board's conclusions that the consideration provided by the Government was adequate, *i.e.*, that it met the terms of the agreement and was sufficient as a matter of law.

 To start with, the contractor contends that the Government neither provided the promised area security nor granted any effective relief from the contract requirement calling for a contractor-paid quality control representative.

In support of its first point, the contractor points to evidence in the record showing that vandalism occurred on the construction site. The existence of vandalism, however, certainly is not synonymous with a failure to provide security. The record clearly shows that the Government did provide security in the form of regular military patrols of the area. The Government did not guarantee (nor could it have) that no vandalism would occur. The Govern-

ment promised, and provided, security to the area.

As to the contention regarding the construction quality control (CQC) representative, plaintiff does not dispute that it was, in fact, relieved of its contract obligation to provide such an on-site representative. However, the argument is that this relief was of little practical value because the contractor retained responsibility for certifying that materials and workmanship complied with contract standards. This too is an argument of little force.

■ Under a Government construction contract, the CQC representative, who is appointed by and acts on behalf of the contractor, certifies to the government on a regular basis that the materials and workmanship of a job conform to the contract requirements. But, despite the CQC's presence, the ultimate responsibility for inspection and acceptance of the work remains with the Government. Therefore, under this contract, both before and after the global settlement, the ultimate responsibility for determining the quality of the work remained with the Government. The Government did not promise to relieve plaintiff from providing quality work, but merely from having to pay an independent subcontractor to fulfill the administrative responsibilities of a CQC representative. The Government *did* relieve the plaintiff of this duty, thus performing this term of the agreement.

■ In addition to challenging the accord from a factual standpoint, plaintiff goes on to attack the Board's conclusion that the Government's promise amounted to adequate consideration as a matter of law. The argument is that since the Board found the liquidated damages clause unenforceable, none of the Government's promises regarding liquidated damages were of any benefit to the contractor and thus cannot be regarded as consideration. This argument too we reject.

The adequacy of consideration is not measured, as plaintiff contends, "in retrospect." At the time of their negotiations, both the Government and the contractor assumed that the liquidated damages clause was enforceable as written. The fact that the assumption later turned out to be mistaken has nothing to do with the validity of an agreement executed on the basis of a good faith belief in its correctness. "The fact that a rule of law renders a promise voidable or unenforceable does not prevent it from being consideration." Restatement (Second) of Contracts, § 78 (1982). Thus, the liquidated damages provisions of the settlement were part of the consideration given to the contractor by the Government.

Plaintiff also argues that the Board accorded too much significance to the consideration given by the Government in its extension of the contract completion date. Plaintiff contends that the Board incorrectly characterized the Government's promise as two separate promises: the first, a 22-day extension and the second, a promise not to collect liquidated damages for that period. The contention is that these are one and the same. The criticism plaintiff raises is irrelevant. Regardless of whether the time extension is considered as one promise or two, it amounts to an additional 22 days of contract performance time and a waiver by the Government of its right to collect $38,016 ($1728 × 22 days) in liquidated damages.

■ Thus, we find that the granting of a contract extension, in conjunction with increasing the contract price by $30,000, providing area security, relieving the contractor of the duty to provide a CQC representative and suspending collection of liquidated damages after October 18, 1976, constitutes adequate consideration to support the contractor's waiver of the claims involved in the global settlement. We uphold the Board's decision determining that Modification No. P00010 constituted an accord that was sufficiently satisfied by the Government's performance of the promises made under that agreement. The accord and satisfaction settled all of the contractor's claims not excluded from the agreement and plaintiff is therefore barred from any further pursuit of these matters. *See Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 58, 343 F.2d 951, 955 (1965).

*The Pilings Claim—ASBCA No. 26977*

The contract called for auger-placed, steel reinforced concrete piles. After the first 14 pilings had been poured, the Navy found that these pilings failed to meet contract requirements in numerous particulars and hence rejected them. Correction of the work required the placement of 12 new pilings and new pile cap type grade beams.

In the "pilings" claim which was presented to the Board, the contractor raised a number of arguments challenging the validity of the Government's rejection of the first 14 pilings. These arguments, which are repeated here (though now with a different emphasis) covered three main points. First, that the contract's specifications specifically authorized the installation of straight reinforcing bars ("rebars") in the concrete pilings; hence the later disapproval of the pilings for lack of hooked reinforcing bars was erroneous. Second, that the Navy's rejection of the pilings for additional claimed defects beyond the absence of hooked reinforcing bars was also erroneous and therefore the corrective effort demanded of the contractor (the construction of 12 additional pilings) was extra-compensable effort. Third, that the Navy had delayed the progress of the work, initially by delaying advice to the contractor on how the corrective work was to be carried out and, subsequently, by furnishing a design for that work that included dimensions for added pile caps that turned out to be incompatible with the routing requirements for sewer and plumbing lines.

■ The Board saw no merit in these contentions. On the chief issue in dispute, the correctness of the rejection of the first 14 pilings, the Board characterized the state of the record in these terms: "There can be no serious argument that appellant failed to comply with a number of specific structural requirements concerning these pilings." 86-1 BCA at 94,035. In substantiation of this assessment, the Board went on to summarize its findings on the issue. First, on the question of straight versus hooked reinforcing steel, the opinion said:

Appellant's correction of the straight piling rebars by installing hooks thereon, as we have found, was clearly required by the contract. Appellant's argument that the installation of the straight bars under the instant contract had been approved is rejected. To the extent such approval was granted, it was based on a misrepresentation of the facts by appellant's subcontractor to the Government. And, as for appellant's contention that straight bars were approved and installed under the predecessor BEQ-1 contract, we have found otherwise. 86-1 BCA at 94,036.

Next, with regard to other structural deficiencies in the pilings, the opinion stated:

We found that because of appellant's lack of control in the positioning of the rebars, virtually none of the 14 pilings were acceptable. Indeed, we are not shown anything by appellant which persuasively contradicts the overwhelming evidence in support of our finding that the contract structural requirements were not met concerning the pilings. Appellant had failed: to provide for a minimum of 3 inches of concrete cover for the first reinforcing steel contact; to place the rebars the contractually specified $3\frac{1}{4}$ inches from the outside face of the piling to allow for the $\frac{1}{4}$ inch spirals; to allow for the critical allowance of $2\frac{3}{4}$ to $3\frac{3}{4}$ inches of concrete cover with respect to the rebar cages; to provide for the tolerance of $-/+\frac{1}{2}$ [inch] or $2\frac{3}{4}$ to $3\frac{3}{4}$ inches for the placement of the rebars, and to evenly space the pilings within the pile holes.

Appellant also failed to extend the spirals above the pile cut-off and into the pile caps, failed to install the concrete so as to avoid a free fall in excess of three feet, and failed to follow the specification requirement that the bars were not to be bent after they were embedded in the concrete. In addition, appellant failed to furnish bars with hooks at the top extending into the pile caps. 86-1 BCA at 94,035.

Based on the foregoing, the Board concluded by saying that "[s]ince all of these unmet requirements were contractually specified, we, accordingly, conclude that the

Government properly rejected the first 14 pilings." 86–1 BCA at 94,036.

Finally, as to the other branch of the argument, the contractor's claim of delay associated with the pile correction work, the Board ruled that "[e]ven if we were to rule otherwise on entitlement on appellant's pilings claim, appellant did not experience any delay as a result of its corrective work on the first 14 pilings." 86–1 BCA at 94,036. The basis for this conclusion is the Board's finding that there was no delay to work on the critical path. In other words, construction of the twelve additional pilings did not affect the scheduled completion time of the next necessary items of work—in this case, the pouring of the floor slab and the commencement of work on the masonry walls. In its finding No. 173 the Board wrote:

> Appellant began laying out the 12 corrective pilings on 20 October 1975 and those pilings were completed on 24 October 1975. The next item on the critical path, the floor slab, was also completed ahead of schedule and appellant began work on the masonry walls, the succeeding critical path item on 12 November 1975, six weeks ahead of the planned schedule. We find no evidence that the rejection of the first 14 pilings delayed overall contract performance as of this date. 86–1 BCA at 94,030 (transcript references omitted).

None of the above-quoted determinations of the Board may be disturbed; the contractor's brief points to no evidence in the record that detracts in the slightest from what the Board had to say about the correctness of the Government's rejection of the first 14 pilings and the lack of any demonstrated delay associated with the correction of these pilings. Indeed, much of what we are given is simply argument and, even at that, not helpful.

For instance, with regard to the Government's insistence that hooks be added to the reinforcing steel in the pilings, the argument is that this action constituted a compensable change because the contract gave the contractor an option to use straight reinforcing bars of appropriate length and to splice as necessary to achieve any required final length. This argument deserves little heed. For one thing, the argument is new—never having been raised below, the point deserves no consideration here. Respect for the integrity of the administrative process dictates that a reviewing court not consider questions on appeal that could have been raised below but were not. *Unemployment Compensation Comm'n v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946); *Wallace v. Department of the Air Force*, 879 F.2d 829, 832–33 (Fed.Cir.1989).

But even if we were to consider the point, it would gain the contractor nothing for the argument has nothing to do with the facts; it is counsel's invention only. The question the parties encountered during performance—and thus the issue the Board was called upon to decide—was whether straight reinforcing bars, embedded in the pile caps to a length of 28 inches, satisfied the contract's requirement. The argument advanced below was that in BEQ–1 (a matching structure earlier completed) the Navy had permitted the rebar subcontractor to delete the hooks at the top of the reinforcing bars and to install straight vertical rebar with an embedment length equal to that specified for hooked rebar, *i.e.*, 28 inches. The specific contention was that similar binding approval had been given here.[2] As we have noted, the Board rejected the argument.

To now argue, as the contractor does, that an embedment length of 44 inches for straight rebar was always seen as the contract requirement, with the only question being whether it was contractually permissible to achieve that length by splicing, is disingenuous. Had the contractor ever contemplated satisfying the contract on that basis, there would have been no need for the meeting of August 6, 1975 between contractor and Government (the subject of

2. The contentions noted are found in the contractor's opening brief before the Board at pages 35 and 36.

finding No. 37—86–1 BCA at 94,010–94,-011) in which the architect/engineer suggested lap splicing (by welding) as one of the methods by which to correct the inadequate embedment length of the reinforcing steel which the contractor had installed. Indeed, if lap splicing had been contemplated from the start (and approved by the Government) there would be no basis for asserting a claim for extra work and materials. The argument, in short, makes no sense. The Board's resolution of the issue concerning hooked versus straight reinforcing steel must stand.

The same result obtains with respect to the other piling deficiencies found by the Board. The contractor addresses these collectively saying: "[i]t has always been and remains the Plaintiff's position that of the 14 condemned piles, only pile No. 200 contained eccentric rebar. The other 13 were serviceable and any actual deficiencies were correctable." However, no evidence is offered to substantiate this statement; so far as we can tell this is counsel alone speaking.

Moreover, the assertion is incorrect. Reference to the exhibits on which the Board relied for some of its conclusions (photographs of the pilings together with an engineering survey recording, *inter alia*, the precise lateral placement of the reinforcing steel in the 14 defective pilings) shows to a certainty that the lateral positioning of the reinforcing steel in the 14 pilings did not conform with the contract's requirements regarding minimum and maximum concrete coverage.[3] These exhibits, and the testimony elicited in respect to them, fully support the Board's finding regarding the improper placement of the piling reinforcement. Further, to assert, as plaintiff does, that this contention was correctable is nonsense—the improperly positioned rebar was embedded in concrete.

Turning to the last point—the contractor's allegation of Government-caused delay associated with the piling rework—the Board, as we have noted, rejected this claim for lack of proof. That is to say, the

Board saw no evidence that the work had hindered timely completion of subsequent tasks lying on the critical path. The contractor challenges this conclusion saying that the Board is wrong on the law and wrong on the facts. As to the law, the contractor maintains that Government-caused delays are compensable even if they do not extend the contractor beyond the scheduled completion date; as to the facts, the contractor says that it endured more than a ten week delay while awaiting receipt from the Government of the architectural design specifying the details for the piling correction work.

We need not address the issue of law which the contractor raises for the argument fails on the facts: there was no two month delay. According to the Board's findings, the pilings were rejected by the Government on August 6, 1975 but plans for their correction were not submitted *by the contractor* until September 23, 1975. (Findings 48 and 53, 86–1 BCA at 94,012). These plans (there were two submissions each covering only pile No. 200) were evaluated by the Government and rejected for lack of technical adequacy. It was only at this point, and at the contractor's request, that the Government took on the task of developing an engineering solution to the structurally defective pilings. That solution, referred to in the record as "Sketch Z," was provided to the contractor on October 16, 1975, about two weeks after it had first been requested. None of these facts are challenged by the contractor; they emphatically refute any claim of Government-caused delay. The delay was of the contractor's own making.

▉ In addition to the points considered above, the contractor had also included in its piling claim a contention that the Government had changed the contract by requiring that the pilings be poured with the use of a concrete pump rather than by means of a chute. The Board rejected this contention saying, "[w]e are unable to find that the Government's civil engineer or any other Navy personnel actually directed ap-

---

**3.** The contract required that the reinforcing bars be placed $3\frac{1}{4}$ inches in from the face of the pile with an allowable tolerance of $\frac{1}{2}$ inch in any direction.

pellant to use a concrete pump instead of an elephant trunk or a tremie." 86–1 BCA at 94,014.

The Board's conclusion is unquestionably correct; on the record before it, no other result could have been reached. The contemporaneous reports which deal with the subject, including plaintiff's own records (quoted in Board findings 62 and 63, 86–1 BCA at 94,014), make clear that use of a concrete pump was a Government suggestion and not a Government directive. Indeed, even the testimony of plaintiff's own witness stops well short of saying that the contractor had been ordered to use a pump. ("We were advised to use a concrete pump" were his words.)[4] Plaintiff's assertion that the Board wrongfully decided the concrete pump issue is frivolous.

### The Catch Basins Claim—ASBCA No. 21661

As part of a storm drainage system, the contract required plaintiff to install six concrete catch basins in the parking lot adjacent to the building. Under the original schedule of work, construction of the catch basins was to have been accomplished during the 60–day period beginning September 1, 1975. In mid-September 1975, after preliminary work for the catch basins had been completed but before any concrete had been poured, the contractor pointed out to the Navy that the specifications for the basins did not include any steel reinforcing bars in the concrete work. The Navy decided that this was error, that rebars should be included, and on October 1, 1975, it verbally instructed the contractor to proceed accordingly. Two days later, the Navy countermanded this oral directive and, instead, requested the contractor to submit a price proposal, within two weeks, itemizing the anticipated extra material and labor costs.

On November 10, 1975, the Navy, having not yet received the requested proposal, formally directed the contractor to proceed with the rebar installation; the price for the work to be fixed at a later date. However, it was not until spring of the following year (April 1976) that work on the catch basins was restarted and completed. In the price negotiations which followed, the parties were unable to come to terms. Hence, resort to the contract's disputes process became the next step.

The gist of the contractor's catch basins claim is that the Navy unreasonably delayed its decision to incorporate reinforcing steel into the catch basins and, as a result, there were additional costs incurred in the performance of the work beyond the added labor and materials involved. Specifically, the contractor contended that much of the work that had gone into the catch basins in the early part of the job—surveying, staking, grading, trenching and pipe lay-out— had to be redone because of weather-caused deterioration. Additionally, the contractor contended that postponement of the catch basin construction carried through to other work on the site thus causing, in the overall, a 40–day delay. Accordingly, plaintiff asked for a price increase of $13,937.00 and a 40–day extension of the contract term. The contracting officer however only allowed a $659.00 increase in contract price—this to cover direct costs, overhead, and profit. The time extension was denied.

In the subsequent proceedings before the Board the contractor fared better, but only marginally so. As to the contractor's claim for costs, the Board ruled that entitlement had been proven (quantum, however, was not determined since the claim was before the Board on liability only) and it remanded the matter to the contracting officer for ascertainment of amount.[5] The costs allowed were not, however, to include any of the costs associated with the repair of weather damage since, as the Board noted, "neither appellant nor its subcontractor

---

4. Testimony of Carl Blaisdell, plaintiff's project superintendent. Hearing Transcript, Vol. 5 at 62.

5. Since the Board had before it only the issue of entitlement, the remand cannot be construed as

intimating either approval or disapproval of the contracting officer's initial allowance of $659 to cover the costs of the extra work involved in the catch basins. *See* the Board's "Summary," 86–1 BCA at 94,045.

took the necessary precautions to protect the open trenches from the potential of erosion and damage." 86–1 BCA at 94,038.

As to the other part of the contractor's claim—the asserted entitlement to a 40-day contract extension—the Board found the proof of entitlement lacking. Attribution to the Government of any delay associated with the catch basin work—whether relating to events occurring before or after November 10, 1975—was rejected by the Board for a number of reasons. Specifically, the Board found that:

(i) completion of the catch basin construction by early October 1975 would not have been possible because materials necessary to that effort (storm drain steel frames and gratings) had not been delivered to the job site,

(ii) progress on the construction of the catch basins after mid-October 1975 was delayed because the contractor had not submitted the requested price proposal by that time,

(iii) no unusual weather conditions were experienced at the job site between October 1975 and November 10, 1975 that would have required a delay in construction,

(iv) completion of construction of the catch basins involved only marginal effort (a total of 12 hours for the installation of rebar and the placement of 3 cubic yards of concrete) and, therefore, could have been completed at any time, (on the basis of this finding the Board rejected as "unconvincing", 86–1 BCA at 94,016, the contractor's testimony that continuance of other work made restart of the catch basin work before April 1976 impossible), and

(v) construction of the catch basins was not on the critical path.

In substance, what the Board decided was that the facts ruled out any bases for saying that the contractor was entitled to a 40-day extension in contract term; postponement of the catch basin work was of the contractor's own doing and choice. In the arguments now before us, we are of-fered no serious reason to dispute the Board's findings or its conclusions. The decision on the claim must therefore stand as written.

### The Shower Valves—ASBCA No. 23044

The contractor installed shower valves which failed to meet contract specifications. The contractor did not heed the Government's directive that the valves be replaced; accordingly the Government undertook that effort on its own and charged the contractor for the costs involved. The issue raised here is whether the Government has recovered more than its actual costs. The issue was never raised below and therefore, as a reviewing court, we have no authority to consider it here.

### The Balcony Correction Claim—ASBCA No. 26751

The plans for the building called for a cantilevered concrete balcony, with concrete handrails, extending along each long side of the second and third floors. The balconies provided the sole means of entering or exiting each living unit.

In early September 1976, after most of the building had been completed, a government inspector observed a significant amount of lengthwise cracking in the balcony concrete adjacent to the building wall and noticed that the top of the balcony handrails did not align properly at the building's seismic joint. Pachometer tests were conducted at selective locations on the second and third floor balconies on the basis of which the Government judged the balconies to be unsafe.[6] The contractor was requested to add temporary shoring pending a decision as to the corrective action to be taken.

Thereafter, more elaborate tests were performed (radiography and selected site destruction) confirming what the earlier tests had indicated: that the contractor had failed to construct the balconies in accordance with the planned design. Chief among the Government's test results was

---

6. Pachometer testing is a type of non-destructive testing performed with an instrument which utilizes magnetic lines of force to determine the presence and depth of steel reinforcing bars embedded in concrete.

the finding that there were no short reinforcing bars (bars measuring eight-feet six-inches) present in the second and third floor balconies except at the corners. The conclusion was that the balconies could not support more than 35 to 40 percent of their designed "live load" capacity.

The contractor was directed to prepare a corrective design that would be both aesthetically acceptable and structurally sound. Five such design proposals were submitted; each was rejected. Finally, on November 12, 1976, the contractor requested that the Government take on the task of preparing the design solution. The Government agreed to do so. To this end, soil tests were undertaken, the data from which was utilized in a corrective design which the Government completed on December 15, 1976. A complete set of construction drawings (based on the corrective design) was provided to the contractor on January 7, 1977. Contractor questions concerning the corrective design were discussed in meetings between the parties in mid-January and construction began on January 20, 1977. The work was completed on November 21, 1977.

The claim which plaintiff presented to the Board, and which it reasserts here, is a demand for a contract price adjustment of approximately $770,000 (together with a time extension of 421 days) in payment for what it claims was extra-contractual effort necessitated by the Government's issuance of initially defective balcony design specifications. The Government denies the charge of design inadequacy. The problem, says the Government, was not in the balcony drawings but in the plaintiff's reading of them. Specifically, the Government contends that the contractor excluded steel reinforcing bars clearly called for by the contract drawings. The Board agreed with the Government; we do also.

■■■ The issue comes down to whether the contract drawings clearly depicted a floor slab construction using eight-foot six-inch reinforcing steel, placed sixteen inches on center, and extending three feet into the balcony area (measured from the building wall line) and five feet six inches into the building living area. The contractor read the drawings as requiring this reinforcing steel only at the building corners rather than across the full length of the balcony/building interface. In support of this reading the contractor points to a note on the slab drawing which reads "Add # 5 Bars Over Wall At Corner As Shown in 2/S–6."

Taken alone, the quoted language could be read in favor of the contractor's position. The problem is, however, that no logical interpretation of the contract drawings could ever support reading that language in isolation as, in fact, the contractor did.

We explain. The language in question appeared as part of a drawing detail depicting the reinforcing bar layout for what was labeled a "Typical Floor Slab Detail," *i.e.*, a detail showing the required placement of transverse reinforcing bars extending along the length of the floor slab at the balcony/building-line interface. Significant here is the fact that this detail did not include the building slab corners; those layout requirements were depicted elsewhere on the same master drawing.

Now as to the note: The entire note (and not just the part the contractor cites) reads as follows:

# 5 @ 16″ O.C.

Add # 5 Bars Over Wall

At Corner As Shown in 2/S–6

Immediately following this note was an arrow marker pointing to a heavied, horizontal line depicting a length of concrete-embedded reinforcing steel that, measured from the building line, extended three feet into the balcony area and, going in the other direction, five feet into the living area.

Given all this information, the argument that number 5 reinforcing bars were to be placed only at the building's corners comes down to saying that the quoted language contained only one instruction, not two; *and* that the drawing detail in which the quoted language appeared said nothing at all about the inclusion of number 5 reinforcing bars in the typical floor slab con-

struction. The argument just won't wash. Whatever else the quoted language may have signified to the contractor with respect to corner construction, there can be no escaping the fact that the note had to have significance with respect to the detail in which it appeared and that, taken together, they portrayed by word and picture that the typical floor slab detail included No. 5 reinforcing steel extending from balcony to living area.

The Board's opinion cites additional reasons for rejecting the contractor's interpretation—inconsistencies with the construction detail for the balcony corners; inconsistencies with the construction details for roof slab—but these need not be gone into here. Suffice it to say, we agree with all that the Board had to say on the point. The contractor misread the contract drawing.

In addition to the contract interpretation issue, the contractor also reasserts here the contention that, even if the drawings were misread, the Government should be estopped from challenging that misreading and the faulty construction that it led to, because Navy officials daily visited the jobsite and thus "knew on a day-to-day basis precisely what steel was being put into the building and knew whether any was omitted."

The Board rejected this argument for lack of any evidence showing "that the Government inspector, or for that matter, any other Government representative, *actually* knew that appellant was proceeding incorrectly regarding the rebars." 86–1 BCA at 94,042 (emphasis original). The same want of proof attends the reassertion of the argument here. Hence, there is no ground upon which to uphold the argument.

There are still other arguments raised by the contractor but discussion of them would serve no purpose. They do not alter the fact that the balconies were not built in accordance with the original design draw-

ings nor do they exonerate the contractor from the liabilities resulting from that unfortunate circumstance.

The court has studied the Board's decision on the balcony corrections claim, reviewed the evidence on which that decision was based and considered the contractor's arguments in opposition to that decision. The decision is correct in all particulars—factual and legal.

*Liquidated Damages—ASBCA No. 26867*
(The Government's Counterclaim)

The Government seeks to recover the damages stipulated in the contract ($1728 per day) for each day between October 18, 1976, the scheduled contract completion date, and November 21, 1977, the actual completion date—a total of 399 days.

The $1728 figure was calculated at the time of contracting using a formula set forth in the Naval Facilities Command Construction Manual ("NAVFAC P–68"). That manual calls for the inclusion of a liquidated damages provision in contracts for construction of living quarters. For Bachelor's Quarters, like those involved here, the damages are to be calculated by multiplying the number of residents expected to be housed by a daily rate of $6.00. In this case the number of residents was set at 288, although the quarters were being built for a total capacity of 309. Thus, the total of the liquidated damages claim amounts to $689,472 ($1728 × 399 days).[7] The Board held the liquidated damages clause to be unenforceable and void as a penalty. We reverse.

The Board stated that there is a "... long held principle that whenever the '... amount stipulated in the contract as liquidated damages for the failure of performance bears no relation to the actual damages which may reasonably be anticipated from such a failure, courts decline to enforce the terms of the stipulation.'" 86–1

---

7. The Government's prayer for relief asks for $682,472. Before the Board, however, the Government sought the entire amount ($1718 × 399 days = $689,472) and the language of its prayer here indicates it intended to seek that

same amount even though its figure has a "2" in the thousand-digit instead of a "9". We deem this to be a harmless error and, accordingly, have adjusted the amount of the Government's original claim.

BCA at 94,045 (quoting *United States v. Kanter*, 137 F.2d 828 (8th Cir.1943), citing *Kothe v. Taylor Trust*, 280 U.S. 224, 50 S.Ct. 142, 74 L.Ed. 382 (1930)). We agree that this correctly states the law in this jurisdiction. The problem we have with the Board's decision, however, is with the premise that the facts of the case justified the application of the rule. They do not.

To explain. The Board thought the rule applicable because:

> The Government failed to show that the liquidated damages set forth in its internal instructions were based upon "... those losses the Government ... expected to suffer due to the failure of the contractor to complete the work on time." The only witness who could testify on such matters had no idea, at the time of contract formation, what the Government expected regarding off-base living expenses in the event of untimely completion. Indeed, there was no proof offered that any Marines had to live off base during the delay period. We can only conclude that losses reflected by the $1728 per day bore no relationship to the actual damages experienced and reasonably anticipated. 86–1 BCA at 94,045.

We understand this to mean that the Board wanted the Government to produce witnesses to testify to the reasonableness of the Government's estimate of its anticipated damages at the time of the making of the contract. What is not clear is whether that testimony was to be directed to the per diem rate (the $6.00 per day) or to the expected building population (the 288 residents). In either case, however, we cannot agree. On the record the Board had before it, no further testimony was necessary on either point.

First, as to the $6.00 per diem, that amount was mandated by a Government regulation specifically designed to address the type of damages the Government is likely to incur in contracts for military housing. The regulation provides tables which identify the daily amounts to be used to calculate liquidated damages for housing construction contracts based on the type of

quarters being constructed. The regulation describes these tables as being:

> based upon those losses the government is expected to suffer due to the failure of the contractor to complete the work on time, such as the cost of substitute facilities, the rental of buildings, or the continued payment of quarters allowances. NAVFAC P–68, ¶ 4–211 *Liquidated Damages* (Dec. 1974).

The regulation further states that:

> In an exceptional case liquidated damages may be varied when the OICC [Officer in Charge of Construction] determines that the Government's anticipated loss from delayed completion is estimated to be significantly in excess of these amounts. In such an exceptional case, a justification for each exceptional determination (including arithmetical computations) shall be made for the files and liquidated damage variations exceeding 25% shall require prior ... approval. *Id.* at P–68.

Thus, as we have said, the very purpose of the regulation is to prescribe those damages the Government could reasonably (and usually) expect to suffer in situations like the present.

Therefore, to hold that the regulation was unreasonable, or in need of substantiation by independent proof, is tantamount to requiring the Government to "reinvent the wheel" each time it enters into a contract for the construction of military housing that is to include a liquidated damages provision. By the Board's reasoning, the Government would be obliged to re-calculate the per diem damage rate for each and every contract. Such a result is impractical, inefficient, and, indeed, unwise because it robs the Government of the more informed decision-making that enters into the development and promulgation of a service-wide regulatory standard. We must presume, therefore, that this regulation, like federal regulations in general, is reasonable absent evidence to the contrary. Here there was no such evidence.

Second, as to the 288 figure, the Board found that the building was intended to house 309 enlisted personnel. In addition,

**14**

the Board found that a critical housing shortage existed at Camp Pendleton during the contract performance period and that this shortage was the justification for the construction of the building. At the time of the making of the contract then, it was reasonable to expect that 288 personnel would have to be housed elsewhere if the building was not completed on time. No more proof than this should have been necessary.

Accordingly, we find that the $1728 stipulated damage figure was reasonable at the time of contract formation. This finding is sufficient for us to uphold the liquidated damages clause. Damages for breach may be liquidated in an agreement at an amount that is reasonable in the light of the anticipated loss caused by the breach. *See* Restatement (Second) of Contracts, § 356(1) (1982). The liquidated damages clause in this contract established such a reasonable amount and is thus enforceable.

In addition to requiring the Government to prove the validity of the numbers appearing in the regulation, the Board's decision could also be understood as holding that proof of actual damages is necessary to sustain a liquidated damages clause. The possibility of such a reading is suggested by the next-to-final sentence of the previously quoted text where the Board said, "Indeed, there was no proof offered that any Marines had to live off base during the delay period." 86–1 BCA at 94,045.

The proposition that actual damages are necessary before liquidated damages become recoverable is incorrect as a matter of law. All that the Government need show is that the damages claimed were reasonably anticipated when the contract was formed. "These provisions are to be judged as of the time of making of the contract." *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 412, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947) (citing *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 121, 27 S.Ct. 450, 456, 51 L.Ed. 731 (1907).

Because we have found above the liquidated damages reasonably approximated the anticipated harm, the clause is enforce-

able despite lack of governmental proof of actual damages. *See Rex Trailer Co. v. United States*, 350 U.S. 148, 152, 76 S.Ct. 219, 221, 100 L.Ed. 149 (1956). We therefore reverse the Board's decision denying the Government's claim for liquidated damages.

### IV

For the reasons given in this opinion, the decision of the Armed Services Board of Contract Appeals holding that there was an accord and satisfaction (herein the Global Settlement) foreclosing the contractor from any further litigation with respect to ASBCA Nos. 23061, 23665, and 26912 is affirmed. The court also affirms the Board with respect to the contractor's claims in ASBCA Nos. 26977 (the Pilings Claim), 21661 (the Catch Basins Claim), 23044 (the Shower Valves Claim) and 26751 (the Balcony Correction Claim). With respect to the Government's claim for liquidated damages (ASBCA No. 26867), the decision of the Board is reversed.

Inasmuch as the claims were before the Board on liability only, there is no authority in the court at this point to address the issue of quantum. *United States v. Anthony Grace & Sons, Inc.*, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). The case must be returned to the Board for further proceedings consistent with this opinion. However, in view of the age of the case, and the size and complexity of the record, it would make more sense for the parties to resolve the quantum determinations on their own. Therefore, the court will defer remanding this case to the Board for a period of 60 days from the date of this opinion in the expectation that, within that time, the parties will be able to agree on an appropriate figure for the entry of judgment.