**THOMAS CREEK LUMBER AND LOG CO., Plaintiff,**

v.

**UNITED STATES, Defendant.**

Nos. 94–362C, 94–544C, 94–545C.

United States Court of Federal Claims.

July 30, 1996.

Joseph A. Yazbeck, Jr., Allen, Yazbeck & O'Halloran, P.C., Portland, Oregon, attorney of record for plaintiff.

Lisa Beth Donis and Gerald M. Alexander, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were David M. Cohen, Director, and the Assistant Attorney General, attorneys of record for defendant.

## OPINION

HORN, Judge.

The United States Department of Agriculture, acting through the United States Forest Service ("Forest Service"), regularly contracts with private companies for the removal of stumpage in the woodlands under its control. On sales of merchantable timber removed, the Forest Service issues Bills for Collection on a regular basis to the purchasers. Those bills are calculated using the current contract rates for merchantable timber, and the volume of timber removed. Three such contracts are currently before the court: the Butte West Salvage I Timber Sale, No. 091433 (the "Butte West Contract") (Case No. 94–362C); the Flintlock SSF Timber Sale, No. 076685 (the "Flintlock Contract") (Case No. 94–545C); and the Westrun Timber Sale, No. 077329 (the "Westrun Contract") (Case No. 94–544C). Thomas Creek Lumber and Log Company ("Thomas Creek") is the plaintiff in each of the above-captioned cases. The three cases have been consolidated before this court. Initially, on January 11, 1995, Case Nos. 94–544C and 94–545C were consolidated. Subsequently, on April 25, 1995, this court consolidated those two cases with Case No. 94–362C.

The Butte West Contract, Case No. 94–362C, is presently before this court on plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment, both pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Plaintiff in the Butte West case appeals from a December 7, 1993 determination of the Forest Service contracting officer, holding that the plaintiff was liable to the Forest Service for $11,161.25 in resale damages, resulting from plaintiff's alleged breach of contract by failing to complete removal of timber under the Butte West Salvage 1 Timber Sale. Plaintiff alleges that the contracting officer's computation of damages was unreasonable due to improper calculation of damages and the failure of defendant to mitigate the damages.

Defendant denies that the damages it claims in the Butte West case are unreasonable, and responds by asserting two counterclaims: first, that the plaintiff is liable to the

defendant for resale damages and accumulating unpaid penalties, administrative costs, and interest on the resale damages, in an amount not less than $11,513.13, as of July 31, 1994; and second, that the plaintiff is liable to defendant for unpaid penalties, administrative costs, and interest on the Butte West unpaid Bills for Collection, in the amount of $34,273.99, as of July 31, 1994. As stated in the government's answer, the defendant requests the following relief:

WHEREFORE, defendant requests that the Court enter judgment in favor of defendant in an amount not less than $45,787.12, plus all interest, penalties, and administrative costs that continue to accrue to the amounts set forth above, that the complaint be dismissed, and that defendant be granted such other and further relief as the Court may deem just and proper.

On the issue of unpaid penalties, administrative costs and interest on the unpaid Bills for Collection, plaintiff answers defendant's second counterclaim by arguing that the Bill for Collection had been paid in full in the principle amount assessed, which did not include the additional charges, penalty or interest, or, in the alternative, that the Bill for Collection was discharged under principles of common law accord and satisfaction or Oregon Revised Statute (ORS) § 73.0311. Plaintiff argues that it discharged its debt when the Forest Service received and deposited Thomas Creek's check in the amount of $129,190.86, on which plaintiff had typed the following restrictive endorsement: "PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 1–28–93 CDA# 6–93–3, CONTRACT # 091433." Plaintiff agrees that summary judgment is appropriate regarding the claims of unpaid administrative charges, interest, and penalties on the defendant's second counterclaim. Plaintiff, however, opposes summary judgment on the issue of resale damages raised in the government's first counterclaim and argues that there are genuine issues of material fact in dispute on the resale issue.

The Flintlock Contract, Case No. 94–545C, is presently before this court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment, both pursuant to RCFC 56. Plaintiff in the Flintlock case appeals from the Forest Service's attempts to recover damages from Thomas Creek, pursuant to a contracting officer's decision, issued February 22, 1994. The contracting officer's decision held that the plaintiff had breached the contract with the government and found that the plaintiff owed the defendant damages in the amount of $97,295.85, the original Bill for Collection, plus additional administrative charges, penalties, and interest, for a total of $101,475.20. Plaintiff alleges that it discharged its obligations to the defendant because the Forest Service received and cashed a check submitted by Thomas Creek in May 1994, in the amount of $97,295.85, on which plaintiff had typed a restrictive endorsement stating: "THIS IS FULL AND FINAL PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 2/22/94 CDA# 6–94–d, CONTRACT # 076685."

Defendant responded by filing an answer denying that plaintiff is entitled to any relief, and by filing a counterclaim against Thomas Creek for unpaid timber charges. The government argues that Thomas Creek has not paid the full amount of timber charges assessed, which includes penalties, interest, and administrative charges assessed under the Flintlock Contract. As of February 4, 1994, the charges totalled $101,475.20, and which continue to accrue through the date of payment in full by Thomas Creek. Therefore, defendant's counterclaim requests the following relief:

WHEREFORE, defendant requests: that the Court enter judgment in favor of defendant for $97,295.85 in timber charges, plus administrative, interest and penalty charges calculated as of the date of payment by Thomas Creek, less $97,295.85; that the complaint be dismissed; and that defendant be granted such other and further relief as the Court may deem just and proper.

In response to defendant's counterclaim, plaintiff argues that its debt should be considered discharged, and that the defendant is not entitled to any of the relief it seeks in its counterclaim, pursuant to the doctrine of ac-

cord and satisfaction, or, in the alternative, Oregon Revised Statute (ORS) § 73.0311.

The Westrun Timber Contract, Case No. 94–544C, also is before this court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment, both pursuant to RCFC 56. Plaintiff in the Westrun case appeals from a contracting officer's decision, dated February 18, 1994.[1] The contracting officer found a breach of contract by the plaintiff on the basis of quarterly escalation adjustment for final volume and per acre material removed and assessed damages in the amount of $24,039.76, the two original Bills for Collection, plus additional charges and interest, which increased the amount due from the plaintiff to $27,259.84. Plaintiff again alleges that its debt should be considered discharged because the Forest Service received and cashed Thomas Creek's check in the amount of $24,039.76, on which plaintiff had typed a restrictive endorsement, stating: "THIS IS FULL AND FINAL PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 2/22/94 CDA# 6–94–c, CONTRACT # 077329."

Defendant denies that plaintiff is entitled to any relief and argues that Thomas Creek has not paid the full amount due under the Westrun Contract, which totalled $27,259.84 as of February 4, 1994, and which will continue to accrue additional damages through the date of payment in full by Thomas Creek. Defendant filed an answer in the Westrun case denying that plaintiff is entitled to any relief, and also asserted a counterclaim against the plaintiff requesting the following relief:

> WHEREFORE, defendant requests: that the Court enter judgment in favor of defendant for $24,039.76 in quarterly escalation and per acre charges, plus administrative, interest and penalty charges calculated as of the date of payment by Thomas Creek, less $24,039.76; that the complaint be dismissed; and that defendant be granted such other and further relief as the Court may deem just and proper.

In response to defendant's counterclaim, plaintiff again attempts to rely on the affirmative defense of common law accord and satisfaction, or, in the alternative, on Oregon Revised Statute (ORS) § 73.0311, to argue that plaintiff's debt should be considered discharged, and that the defendant is not entitled to any of the relief it seeks in its counterclaim.

## FACTUAL BACKGROUND

### I. Butte West Contract, Case No. 94–362C.

On September 23, 1991, Thomas Creek entered into the Butte West Salvage I Timber Sale Contract, No. 091433, with the Forest Service. The Butte West Contract's termination date was November 30, 1992. Pursuant to the terms of the contract, Thomas Creek was required to cut and remove all timber located upon the Butte West Contract area and to pay the United States Forest Service for the timber removed.

In the Butte West Contract, as in the other timber sales at issue in the above-captioned cases, the Forest Service issued regular Bills For Collection to plaintiff for merchantable timber removed. The bills in the Butte West Contract were calculated using the current contract rates for merchantable timber and the volume of timber removed. The Butte West sale was an indexed, escalated-price sale, which effectively adjusts the prices for merchantable timber every quarter in accordance with a specified index that tracks market conditions. At the end of every quarter during the Butte West Contract, Thomas Creek received either a credit or a Bill for Collection for an additional amount, based upon application of the escalation price index to the volume of merchantable timber removed by Thomas Creek during that quarter. The Butte West Contract included an interest provision, Part C4.4—Payments Not Received. The same provision also was included in the Flintlock and Westrun Contracts. In pertinent part, that provision reads:

> originally dated February 4, 1994, should have been dated February 18, 1994.

---

1. In a letter dated February 22, 1994, the contracting officer, Paula A. Fong, sent a letter to plaintiff that the contracting officer's decision,

C4.4—PAYMENTS NOT RECEIVED. (9/89) When payment is not received by collection officer or depository at the designated address within 15 calendar days of billing, or when the credit balance in Timber Sale Account is less than the amount due for timber estimated to be cut in 10 calendar days, Forest Service may suspend all or any part of Purchaser's Operations until payment or acceptable payment guarantee is received.

Failure to pay amounts due when payments are guaranteed by a payment guarantee shall be considered a breach under B9.3, and the 30 calendar day notice period prescribed therein shall begin to run as of the end of business of the fifteenth calendar day allowed for payment. Such payments received after the due date are subject to an interest charge at the current rate of interest prescribed by the U.S. Department of Treasury (TFM 6–8025.40), as published in the FEDERAL REGISTER, for the period beginning from the date the bill was due. Such interest rate shall remain unchanged until those bills have been paid or settled. If follow-up billings become necessary due to failure to pay principal and/or interest due, cost of such billings shall be added to the amounts due. In addition, any amounts overdue in excess of 90 days shall be subject to an additional 6 percent interest charge. Payments will be credited on the date received by the designated collection officer.

Forest Service remedies for Purchaser's failure to pay amounts due, except for accrual of interest and suspension of all or any part of Purchaser's Operations and Administrative offset, shall be stayed for so long as (a) a bona fide dispute exists as to Purchaser's obligation to make such payment, and (b) Purchaser files and prosecutes a timely claim under the Contract Disputes Act of 1978.

On December 18, 1991, however, the Forest Service notified Thomas Creek of its intention to administratively offset[2] funds held by the United States and payable to Thomas Creek against twenty-four (24) outstanding Bills for Collection, which exceeded $1.5 million, on Thomas Creek contracts other than the Butte West Contract. As of June 25, 1992, Thomas Creek could have had $128,737.00 available to it on the Butte West Contract in purchaser credits and downpayment, had the Forest Service not already offset that money against amounts the For-

2. In addition to plaintiff's allegation contesting the right of the government to the offset purchaser credits and a downpayment on the Butte West Contract against the twenty-four (24) other contracts, plaintiff also made a claim that it was entitled to an offset against the amounts due in the three above-captioned cases, based upon plaintiff's claim to an entitlement of $1.4 million allegedly accumulated during performance of an otherwise unrelated contract filed as *Thomas Creek Lumber & Log Co. v. United States*, (Case Nos. 94–312C and 93–426C) (the Parkette 90 Contract). The Parkette 90 cases were assigned to Judge Kenneth Harkins, also in the United States Court of Federal Claims. The plaintiff's $1.4 million claim in the Parkette 90 Contract case, however, was limited to $69,740.00, by a bench ruling issued by Judge Harkins on December 15, 1993 and was then dismissed by the court on March 27, 1996. Judge Harkins denied relief to the plaintiff and awarded judgment to the defendant on its Bill for Collection. Moreover, at the February 26, 1996 oral argument in the above-captioned cases, plaintiff's attorney conceded that offset was not an issue in any of the above-captioned cases in any regard, and the following colloquy ensued:

THE COURT: Explain to me what issues there are regarding offset, if any.

MR. YAZBECK: Well, the offset issue was the we had a claim against the Forest Service and the Forest Service had these claims against us, and we believed we had the right to offset the Forest Service claims—

THE COURT: But how does apply in our cases here this afternoon?

MR. YAZBECK: It was our reason for, uh, for stating the—stating to the Forest Service that the—that the amounts—the underlying amounts were not currently owed, because our claims exceeded their claims.

THE COURT: All right. In terms of resolution of these three cases, is there still an offset issue?

MR. YAZBECK: No, Your Honor, there is not still an offset issue.

THE COURT: So we can just go ahead and decide what we need to decide on the restrictive endorsement and on the resale. We don't have to worry about offset anymore. It's just essentially a moral justification for why you did what you did?

MR. YAZBECK: For why we didn't pay those at that particular—

THE COURT: At the time. The offset issue is not relevant anymore?

MR. YAZBECK: Right.

est Service contended Thomas Creek owed it on those twenty-four (24) unrelated contracts.

On May 29, 1992, the Forest Service notified Thomas Creek that it had breached the Butte West Contract by failing to pay Bill for Collection No. 182428 for the month of April in the amount of $36,418.77, and suspended Thomas Creek's contract performance on the Butte West Contract due to its failure to pay. On June 10, 1992, the Forest Service issued a Bill for Collection No. 182290, due June 25, 1992. This bill included the unpaid amount due for April stumpage, plus May stumpage, less purchaser credits earned after the offset by the government. According to the government, the remaining balance due to the government on the Butte West Contract totalled $144,045.27, on June 25, 1992.

Thomas Creek, however, deducted the $128,737.00 purchaser credits and downpayment from the Butte West Bill for Collection No. 182290, issued in the amount of $144,-045.27, and determined that it only owed the Forest Service the sum of $15,308.27 on the Butte West Contract. Although the Bank of America deposited the $15,308.27 payment sent by Thomas Creek, the government refused to apply the previously earned purchaser credits or the original downpayment, claiming those amounts had already been offset. The defendant computed the remaining balance on the Butte West Contract to be $129,190.86, the balance of the original amount, plus quarterly escalation. On July 10, 1992, Thomas Creek was issued Bill for Collection No. 182630, which was due on July 25, 1992. This bill was reduced by plaintiff's June 25, 1992 payment of $15,308.27, and was adjusted for quarterly escalation, resulting in a new balance due of $129,190.86.

Although Thomas Creek maintained in its briefing that the $128,737.00 in purchaser credits and downpayment should have been available to Thomas Creek on the Butte West Timber sale to pay Bill for Collection No. 182290, plaintiff apparently had abandoned that argument prior to filing the Butte

West complaint in an attempt to make plaintiff eligible to compete for new timber sales for which the government would not consider Thomas Creek without payment of its outstanding Bills for Collection.

Thomas Creek's operations remained suspended through the contract termination date, however, because Thomas Creek failed to bring its account current with the Forest Service. On November 30, 1992, the Butte West Contract term expired, and Thomas Creek's contract work remained uncompleted. At the time of the termination, an estimated volume of 38,000 board feet of timber remained uncut upon the Butte West Contract area.

Because of Thomas Creek's refusal to pay the Forest Service, the contracting officer, William J. Bramwell, issued a contracting officer's final decision on January 28, 1993.[3] Mr. Bramwell's January 28, 1993 decision and accompanying Bill for Collection No. 180244 determined that Thomas Creek was liable to the government for $139,522.81 on the Butte West Contract, $129,190.86, plus additional costs of unfinished contract work in the amount of $237.50, administrative charges, interest, and penalties, which would continue to accrue until paid in full. In addition, the contracting officer's decision indicated that damages due as a result of the resale of the remaining timber, pursuant to the standard resale contract provision, C9.4—Failure to Cut, would be determined at a later date. According to the contracting officer, seasonal weather conditions limited access to the contract area and prevented immediate resale of the contract.

The standard resale contract provision states, in pertinent part:

C9.4—FAILURE TO CUT. (9/89) In event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination Date, Forest Service shall appraise remaining Included Timber, unless termination is under C8.2 or B8.22. Such appraisal shall be made with the standard

---

**3.** Gary Biles was the original contracting officer, but as a contracting officer in his own right, Mr. Bramwell had independent authority to sign and approve certain matters upon his behalf. Mr.

Bramwell became the primary contracting officer for the Butte West contract on or about December 12, 1991.

Forest Service method in use at time of termination.

Damages due the United States for Purchaser's failure to cut and remove Included Timber meeting Utilization Standards shall be the amount by which Current Contract Value, plus costs described below, less any Effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and unused Effective Purchaser Credit, plus any of the following applicable costs:

(1) The cost of resale or reoffering;

(2) Any increase in Purchaser Credit Limit allowance for unconstructed Specified Road facilities which are needed to harvest the remaining uncut volume. Such increases are limited to costs for constructing the road to the same standard and specifications required by this contract;

(3) If Purchaser has failed to cut individual trees in the portions of Sale Area cutover and there is no resale of such individual trees, Purchaser shall pay Forest Service for cost of felling and removal or otherwise eliminating such uncut trees in addition to payment of damages described above, except for occasional trees not cut for reasons stated in B6.4;

(4) The Government's loss caused by the delay in receipt of stumpage payments. Such loss will be measured by interest at the current rate being paid for borrowing by the United States (as calculated and published by the Treasury Department in TFM 6–8025.40) on the unpaid contract value at Termination Date. Interest will be charged for the total numbers of months, or portions thereof from Termination Date until midpoint of the contract resale period, less any time in excess of 1 year needed to make the resale;

(5) Any increase in reforestation costs, including site preparation, seeding and planting caused by Purchaser's failure to harvest Included Timber by Termination Date.

On October 7, 1993, the Forest Service resold the remaining portion of the Butte West Contract. The resale contract did not contain exactly the same terms as the original contract because the resale contract did not include a price escalation provision. According to the contracting officer, a stumpage rate adjustment provision could not be included in the resale contract because the term of the resale contract was less than one year.

On December 7, 1993, the contracting officer issued a post-resale decision on the Butte West Contract, and found that Thomas Creek was liable to the defendant for resale damages, as follows:

| | |
|---|---|
| Current Contract Value of Uncut Timber at Termination | $32,140.60 |
| Plus Cost of Resale | $ 1,327.00 |
| Less Effective Purchaser Credit | 0.00 |
| Less Resale Bid Value | $22,306.35 |
| Subtotal | $11,161.25 |
| Plus Administrative Charges | $ 15.00 |
| Total | $11,176.25 |

Thomas Creek requested a meeting with the Forest Service to discuss not only the Butte West contracting officer's decision, but also the contracting officers' decisions in the Flintlock and Westrun Contracts. The meeting was held on April 13, 1994. Plaintiff acknowledges that the meeting concluded with no agreement regarding the amounts due from the plaintiff on any of the contracts, and that no agreement to compromise the amounts due to the government was entered into by the parties. Moreover, at no time during Thomas Creek's dealings with the government did any government employee ever indicate to Thomas Creek that the Forest Service would accept anything less than full payment of the amounts claimed in the contracting officers' decisions, in return for discharge of those debts. Nonetheless, plaintiff now claims that the government officials in attendance at the meeting had the authority to compromise the claims that were the subject of the meeting.

On April 12, 1994, the day before the meeting to discuss the contracting officer's decisions and the amount due on the three cases currently before the court, a Bill for Collec-

tion in the Butte West case (Bill No. 180331), in the principal amount only ($121,190.86), was automatically issued by the Forest Service to Thomas Creek during the course of a routine billing cycle. The record demonstrates that Bill for Collection No. 180331 was received by Thomas Creek at its office while plaintiff was at the April 13, 1994 meeting, and that the bill was telecopied by Thomas Creek to its lawyers later on that same day. Furthermore, after the April 13, 1994 meeting, and after plaintiff received the bill on April 13, 1994, Thomas Creek's lawyer received a letter from a Forest Service attorney, also dated April 13, 1994, which stated that the Forest Service did not view any offer as having been made by Thomas Creek, or accepted by the government at the meeting, and that the attorney could give "no assurance that anything less than full payment of these bills (the Flintlock, Westrun, Parkette 90 and Butte West sales) will result in a contracting officer finding of current responsibility."

As of April 28, 1994, the total amount due to the Forest Service on the Butte West Contract from Thomas Creek was $173,819.07. Of that figure, approximately $166,500.00 was related to the contracting officers' decision, dated January 28, 1993. The remainder pertained to the second contracting officer's decision on resale damages, dated December 7, 1993. Thomas Creek, however, contends that as a result of receiving the Butte West Bill for Collection No. 180331 for the original amount only, it believed the Forest Service had accepted plaintiff's position and had agreed to compromise. Therefore, according to the plaintiff, on April 28, 1994, Thomas Creek sent a check to the Forest Service in the amount of $129,190.86, not reflecting interest, penalty, or administrative charges, allegedly in full satisfaction of all claims included in the contracting officer's January 28, 1993 decision.

Plaintiff mailed the check to the Forest Service's post office lockbox in San Francisco, California. The face of Check No. 13233 for the Butte West timber sale contained no extraordinary markings, but referenced "Butte West Contract 091433." On the reverse side of the check, the plaintiff typed the following: "PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 1–28–93 CDA # 6–93–3, CONTRACT # 091433." Thomas Creek had not notified the contracting officer that it intended to submit a conditional check. Subsequently, on May 11, 1994, the government sent plaintiff a Bill for Collection No. 180355 for the balance due in the Butte West Contract in the amount of $48,806.18.

The Forest Service has a contractual relationship with Bank of America National Trust and Savings Association ("Bank of America") nationwide for the processing of check payments through lockboxes. Bank of America provides lockbox processing services for the entire Forest Service, nationwide. The Forest Service, however, has not delegated contracting officer authority to any official or employee of the Bank of America. When parties across the nation make payments to the Forest Service, they may send checks, by United States mail, to a United States Postal Service lockbox located in San Francisco, California. In a typical week, Bank of America processes thousands of checks for the Forest Service. According to the joint stipulations entered into by both parties in the above-captioned cases, on a daily basis, Bank of America employees retrieve the mail from the lockbox, open the envelopes and extract the checks and Bills for Collection. Although the faces of the checks are examined, the backs of the checks are not inspected or reviewed by Bank of America employees.

Bank of America employees then run the checks through a mechanical processing machine, which performs a number of functions. For example, the machine creates a microfiche photocopy of the check, imprints the keyed-in amount upon the face of the check, and places a mechanical endorsement upon the back of the check. That endorsement includes codes for the specific Forest Service accounts, batch numbers, and sequence numbers. The placement of the endorsement is entirely mechanical, and performed entirely by the processing machine.

After mechanical processing, Forest Service accounts are provisionally credited, and the physical checks are returned to drawee

banks. Information regarding the deposits is stored upon a diskette and an on-line computer. Forest Service offices nationwide then are able to log onto the system to retrieve information about their accounts. After processing is complete, Bank of America sends copies of the checks, Bills for Collection, and a "remittance advice" to the regional offices of the Forest Service. At no point in the check receipt and account crediting process does a Bank of America employee ever inspect or review the backs of checks for restrictive endorsements. To do so would require substantial alteration to the manner in which the thousands of checks submitted to the Forest Service are processed, at an increased cost to the government.

The contracting officer had no knowledge of the receipt of Thomas Creek's check submitted in the Butte West case until after it was accepted and deposited for the Forest Service by the Bank of America. Furthermore, the individuals who accepted and processed the check did not confer with the contracting officer regarding whether to deposit the check and did not have authority to compromise any Forest Service claim arising out of the contracting officer's decision.

After the check was processed by Bank of America for the Forest Service, Joseph Yazbeck, attorney of record for Thomas Creek, submitted correspondence to the Forest Service on July 27, 1994, wherein, for the first time, he asserted that the typed condition upon the reverse side of the check, and the subsequent processing of the check on behalf of the Forest Service, discharged Thomas Creek's obligations in its entirety. The Forest Service responded on August 3, 1993, stating that Mr. Yazbeck's legal analysis was incorrect, although defendant did cite to Oregon's version of the Uniform Commercial Code, ORS § 73.1230.[4]

## II. *Flintlock Contract, Case No. 94–545C.*

On July 14, 1992, Thomas Creek entered into the Flintlock SSF Timber Sale, No.

076685, with the Forest Service. The contract termination date for the Flintlock sale was originally March 31, 1993, but later was adjusted to September 1, 1993.

According to the provisions of the Flintlock sale provision, the Forest Service regularly issued Bills for Collection to Thomas Creek for merchantable timber removed in accordance with the contract. Those bills were calculated using the current contract rates for merchantable timber and the volume of timber removed. The Flintlock sale also included the interest provision, Part C4.4—Payments Not Received, which was identical to the provision set forth in the other two contracts at issue.

In accordance with the terms of the Flintlock Contract, the Forest Service issued a Bill for Collection on September 10, 1993, in the amount of $97,295.85 for the final volume of timber removed, which required Thomas Creek to make payment on or before September 25, 1993. Thomas Creek did not make payment by that date and did not offer any explanation for its failure to pay. On September 30, 1993, Jerry Hernandez, the Forest Service Representative, notified Thomas Creek that it was in breach of the contract for its failure to make payment.

Prior to the issuance of the contracting officer's decision, Thomas Creek did not offer any correspondence or communication to the Forest Service to notify the defendant that plaintiff's refusal to make payment was based upon an asserted right of offset. Thomas Creek subsequently maintained that it was entitled to disregard payment of this bill, and any interest or penalty charges, due to a right of offset. The offset issue, however, is no longer part of the lawsuit currently pending before this court.[5]

On October 1, 1993, the Forest Service Representative made a demand for payment upon Thomas Creek's surety in the amount of $97,400.79, which included the original billed amount, $97,295.85, plus administrative charges and interest, pursuant to the con-

---

4. The Oregon Revised Statute section cited in the Forest Service's August 3, 1994 letter is not the same section which is in dispute in the instant case.

5. As discussed above, at oral argument, plaintiff dropped its claimed entitlement to an offset in the above-captioned cases. (See footnote 2, above.)

tract, through the date of demand. On December 7, 1993, the Forest Service Representative made another demand upon Thomas Creek's surety for $98,420.12, the original billed amount plus additional administrative charges and interest.

Because of Thomas Creek's refusal to pay the Forest Service for the timber it had received, and for the interest, penalty, and administrative charges due, John D. Berry, the contracting officer, issued a decision on February 22, 1994.[6] In his decision, Mr. Berry determined that Thomas Creek was liable to the government for the original billed amount of $97,295.85, plus administrative charges, interest, and penalty charges. Therefore, as of February 4, 1994, the date upon which the contracting officer's decision was issued, the total damages for the timber volume claim was $101,475.20. Moreover, the defendant argues that interest and penalty charges continue to accrue until the debt is paid.

As indicated above, Thomas Creek requested a meeting with the Forest Service to discuss the Flintlock contracting officer's decision, as well as the contracting officers' decisions on the Butte West and Westrun Contracts. That meeting was held on April 13, 1994. According to plaintiff, the government's acceptance of plaintiff's check in May 1944 for the amounts owed on the Butte West Contract, and the meeting held on April 13, 1994, indicated to Thomas Creek that the government had decided to compromise its claims. Thomas Creek, therefore, sent a check to defendant for the Flintlock Contract, again only for the principal amount, $97,295.85, as settlement of the debt in full. This check also did not include the amount owed for interest, penalty, and ad-

ministrative charges assessed in the contracting officer's decision. The plaintiff mailed the check to the Forest Service's post office lockbox in San Francisco, California.[7] The face of Thomas Creek's Check No. 13404 for the Flintlock timber sale contained no extraordinary markings, but referenced "Flintlock Bill # 30360." On the reverse side of the check, the plaintiff typed in the following: "THIS IS FULL AND FINAL PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 2/22/94 CDA# 6–94–d, CONTRACT # 076685." Prior to May 1994, Thomas Creek had not provided any written indication that it intended to submit a conditional check. The contracting officer had no knowledge of the receipt of plaintiff's check until after it was deposited for the Forest Service by the Bank of America employees, nor did the individuals who processed the check have authority or delegated authority to compromise any Forest Service claim arising out of the contracting officer's decision.

Bank of America employees examined and processed the check for the Flintlock timber sale in the standard manner. After plaintiff's check had been processed by Bank of America on July 27, 1994, Thomas Creek submitted correspondence to the Forest Service in which it asserted for the first time that the typed condition upon the reverse side of the check, and the processing of the check upon behalf of the Forest Service, discharged Thomas Creek's obligations under the Flintlock Contract. The Forest Service responded by letter on August 3, 1994, stating that Mr. Yazbeck's legal analysis was incorrect, although defendant did cite to Oregon's version of the Uniform Commercial Code, ORS § 73.1230.[8]

---

6. Mr. Berry had contracting officer authority to issue and sign contracting officer decisions upon "ranger district" sales of less than 2 million board feet. Because the Flintlock sale was less than 2 million board feet, Mr. Berry had valid, delegated authority to act as contracting officer on the Flintlock sale.

7. Thomas Creek's president, Brent C. Walker, claims in his affidavit that Thomas Creek did not receive any additional Bills For Collection after it had sent the check in the amount of $129,190.86 for the Butte West timber sale. In actuality, however, the Forest Service continued to assess

the interest, penalty, and administrative charges on the Butte West Bill for Collection. The Forest Service then sent Thomas Creek a Bill For Collection, No. 180355, in the amount of $48,-806.18, which was provided to Thomas Creek on May 11, 1994, eleven days prior to Thomas Creek's issuance of the check for the Flintlock timber sale.

8. The Oregon Revised Statute section cited in the Forest Service's August 3, 1994 letter is not the same section which is in dispute in the instant case.

III. *Westrun Contract, Case No. 94–544C.*

On August 14, 1990, Thomas Creek entered into the Westrun Timber Sale, No. 077329 with the Forest Service. The contract termination date for the Westrun sale was originally March 31, 1993, but later was adjusted to October 22, 1993.

As on other timber sales, in the Westrun sale, the Forest Service regularly issued regular Bills for Collection to plaintiff for merchantable timber removed. The Bills for Collection were calculated in the exact same manner as for the other two contracts discussed above and used the current contract rates for timber and volume of merchantable timber removed. The Westrun sale was an indexed, escalated-price sale, which effectively adjusts the prices for merchantable timber, quarterly, to track market conditions. At the end of every quarter, Thomas Creek received either a credit or a Bill for Collection for an additional amount, based upon application of the escalation price index to the volume of merchantable timber removed by Thomas Creek during that quarter. In addition to the merchantable timber provisions, the Westrun Contract also required Thomas Creek to pay for "per-acre" material. That requirement was a flat fee paid to the Forest Service for each acre of the sale, to cover non-merchantable timber volume removed by Thomas Creek. Furthermore, the Westrun sale also included the interest provision, Part C4.4—Payments Not Received, which was identical to the provision set forth in the other two contracts.

On January 13, 1993, the Forest Service issued a Bill for Collection to Thomas Creek for quarterly escalation charges in the Westrun Contract in the amount of $13,868.30. Payment of that bill was due on January 28, 1993, however, Thomas Creek did not make payment by that date. Similar to the situation in the Butte West and Flintlock cases, prior to the issuance of the contracting officer's decision, Thomas Creek failed to communicate to the Forest Service that its refusal to make payment was based upon as asserted right to offset.[9] Thomas Creek subsequently asserted that it was entitled to

disregard payment of this bill, and any interest or penalty charges, pursuant to an asserted common law right of offset.

On February 2, 1993, the Forest Service notified Thomas Creek that it was in breach, due to plaintiff's failure to pay the amount due on the January 13, 1993 bill. On February 4, 1993, Jerry Hernandez, the Forest Service Representative, made a demand upon Thomas Creek's surety for the original billed amount, $13,868.30, plus administrative charges and interest, up to and including February 4, 1993, the date of the demand. The total billed amount was $13,910.59. On March 10, 1993, the contracting officer, Richard C. Blashill, made another demand upon Thomas Creek's surety for a total of $14,019.56, including the original billed amount, plus administrative charges and interest, through the date of the demand. On April 21, 1993, the contracting officer made another demand upon Thomas Creek's surety, this time for $14,148.28, which included the original billed amount, $13,868.30, plus additional administrative charges and interest, pursuant to the contract, up to and including the date of the demand. The demand also indicated that the contractual six percent penalty charge would be added if payment was not made.

An audit of the Westrun Contract prior to its termination revealed that Thomas Creek had not paid for thirty-eight acres of per-acre removed material. As a result, in addition to the above Bills for Collection for escalation charges, the Forest Service issued another Bill for Collection to Thomas Creek on February 10, 1993, in the amount of $10,171.46. Payment of that bill was due on February 25, 1993, however, Thomas Creek did not make payment by that date. Thomas Creek subsequently asserted that it was not required to pay this bill, and any interest or penalty charges, pursuant to an asserted common law right of offset, but failed to notify the Forest Service of its position.

On March 1, 1993, the Forest Service Representative notified Thomas Creek that it was in breach for its failure to pay the

---

9. As discussed above, at oral argument of the above-captioned cases, plaintiff dropped its claimed entitlement to an offset in the above-captioned cases. (See footnote 2, above.)

amount due in the February 10, 1993 bill. The Forest Service Representative made a demand upon Thomas Creek's surety on March 4, 1993, for $10,209.13, which included the original billed amount, $10,171.46, plus administrative charges and interest, pursuant to the contract, through the date of the demand. On April 7, 1993, the contracting officer made another demand upon Thomas Creek's surety for $10,295.73, the original billed amount, plus administrative charges and interest, through the date of the demand. Then, on May 10, 1993, the contracting officer made another demand upon Thomas Creek's surety for $10,380.50, which also included the original billed amount, plus administrative charges and interest.

Because of Thomas Creek's refusal to pay the Forest Service, Paula Fong, the contracting officer, issued a contracting officer's decision in the Westrun case on or about February 18, 1994.[10] In the contracting officer's final decision, she was determined that Thomas Creek was liable to the government for both of the original billed amounts, plus additional interest, penalty, and administrative charges for each of the claims. The assessed damages as of February 4, 1994, the date upon which the contracting officer's decision was prepared, totalled $27,259.84.[11]

As discussed above, Thomas Creek met with government representatives on April 13, 1994, to discuss the Butte West, Flintlock, and Westrun contracting officers' decisions. And, as discussed above, that meeting concluded with no agreement on the amounts due upon any of the three contracts. In fact, according to the joint stipulations of fact submitted by both parties in this case, at no time has any government employee ever indicated to Thomas Creek in any way that the Forest Service would accept anything less than full payment of the amounts claimed in the three contracting officer's decisions, in return for discharge of those debts.

According to plaintiff, however, based on the processing of Thomas Creek's check for the principal amount only in the Butte West case and, according to the plaintiff, on what had occurred at the April 13, 1994 meeting, Thomas Creek sent Check No. 13407 in the amount of $24,039.76 to the government. This check did not reflect the interest, penalty, and administrative charges assessed to the Forest Service's post office lockbox in San Francisco, California.

The face of Check No. 13407 contains no extraordinary markings, but references "WESTRUN, BILL# 30197." On the reverse side of the check, plaintiff typed the following: "THIS IS FULL AND FINAL PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 2/22/94 CDA# 6–94–c, CONTRACT# 077329." Prior to May 1994, Thomas Creek had not provided notification to the contracting officer that it intended to submit a conditional check.

Bank of America employees examined and processed the check for the Westrun Timber Sale in exactly the same manner as they did for both the Butte West and Flintlock Contracts. The contracting officer had no knowledge of the receipt of Thomas Creek's check until after it was accepted and deposited for the Forest Service by the Bank of America. In fact, during the processing of plaintiff's check by Bank of America employees, none of the individuals involved in processing the check conferred with any Forest Service employee who had contracting authority. As discussed above, Thomas Creek's attorney, Mr. Yazbeck, sent correspondence to the Forest Service for the first time on July 27, 1994, asserting that the

---

10. The decision was originally dated February 4, 1994, but Ms. Fong states in a declaration submitted by plaintiff that it should have been dated February 18, 1994, the date it was actually issued. Moreover, although Richard Blashill was the original contracting officer, as a contracting officer in her own right, Paula Fong had independent authority to sign and approve certain matters upon his behalf. Furthermore, in anticipation of Mr. Blashill's retirement, Paula Fong had assumed the primary contracting officer role for the Westrun sale on or about February 7, 1994.

11. Damages related to the quarterly escalation adjustment for final volume removed were the following: original bill, $13,868.30; interest, $918.73; penalty, $892.80; and administrative charges, $90.00. Damages for per-acre material removed were the following: original bill, $10,-171.46; interest, $623.11; penalty, $605.44; and administrative charges, $90.00.

typed condition upon the reverse side of the Westrun check, and the processing of the check upon behalf of the Forest Service, discharged Thomas Creek's obligations under the Westrun Contract. The Forest Service responded on August 3, 1993, stating that Mr. Yazbeck's legal analysis was incorrect, although defendant did cite to Oregon's version of the Uniform Commercial Code, ORS § 73.1230.[12]

## DISCUSSION

### SUMMARY JUDGMENT

In the above-captioned cases, the parties have filed cross-motions for summary judgment. Thomas Creek alleges, with regard to defendant's second counterclaim in the Butte West case and the sole counterclaims in the Flintlock and Westrun cases, that, as a matter of law, plaintiff's checks for payment on each of the three contracts contained restrictive endorsements and, therefore, any debts owed by plaintiff to the Forest Service should be considered discharged. In the Butte West case only, defendant also made a cross-motion for summary judgment on the issue of resale damages, which is the subject of defendant's first counterclaim. Plaintiff, in its response to defendant's first counterclaim, alleges that award of resale damages would be unreasonable, due to miscalculations by the defendant and the failure by the defendant to mitigate damages. Moreover, with regard to the claims regarding resale damages, plaintiff argues there are material facts in dispute, which cannot be resolved by means of a summary judgment motion.

■ Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of this court is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[13] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the non moving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd without op.*, 937 F.2d 622 (Fed.Cir.

---

**12.** The Oregon Revised Statute section cited in the Forest Service's August 3, 1994 letter is not the same section which is in dispute in the instant case.

**13.** In general, the rules of this court are closely patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including Rule 56. *See Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed. Cir.1993); *Imperial Van Lines Int'l Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present the evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

■ If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

■ The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assocs.,* 20 Cl.Ct. at 679.

Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

■ In the above-captioned case, the fact that both the parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States,* 29 Fed. Cl. 318, 322 (1993), *aff'd* 31 F.3d 1176 (Fed. Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.,* 812 F.2d at 1391.

After an examination of the record in the above-captioned cases, this court has determined that no genuine issues of material

facts exist regarding plaintiff's claims that its obligations were discharged and, therefore, the issue is ripe for summary disposition in each of the three above-captioned cases. As is discussed more fully below, however, on the issue of resale damages in the Butte West case, the court finds that genuine material issues of fact are in dispute, and finds that summary judgment is not appropriate.

### OFFSET

In the three above-captioned cases, the issue of offset arises in two separate contexts in the pleadings. One offset issue arises in the Butte West, Flintlock, and Westrun Contracts and is based on plaintiff's claim for $1.4 million filed in the United States Court of Federal Claims in the otherwise unrelated cases of *Thomas Creek Lumber & Log Co. v. United States,* (Case Nos. 94–312C and 93–426C) (the Parkette 90 Contract). As indicated above, the plaintiff's claim in the Parkette 90 Contract case was voided by Judge Harkins of this court when he denied plaintiff any relief and awarded judgment to the defendant on its Bill for Collection.

The other offset issue occurs only with respect to the Butte West Contract. On December 18, 1991, the Forest Service notified Thomas Creek of its intention to administratively offset funds held by the United States and payable to Thomas Creek against twenty-four (24) outstanding Bills for Collection on Thomas Creek contracts other than the Butte West Contract, which exceeded a total of $1.5 million. If this administrative offset by the Forest service had not occurred, the Butte West Contract account would have shown a balance of $128,737.00 in purchaser credits and downpayments, which otherwise would have been available and due to Thomas Creek. Despite the government's action, however, Thomas Creek deducted the $128,737.00 when it calculated what it owed the Forest Service and concluded that its liability was only $15,308.27, the difference between the $144,045.27 owed for Bill for Collection No. 182290 minus the $128,737.00 in purchaser credits and downpayments. Therefore, on June 25, 1992, plaintiff sent a check to the government for $15,308.27 as payment in full. Although the check was deposited by Bank of America employees, the defendant nonetheless computed plaintiff's remaining balance on the Butte West Contract to be $129,190.86, the balance of the original amount, plus quarterly escalation.

Although Thomas Creek maintained in its briefing that the $128,737.00 in purchaser credits and downpayment should have been available to Thomas Creek on the Butte West timber sale to pay Bill for Collection No. 182290, plaintiff later appears to have abandoned that argument prior to the instant law suit in order to make plaintiff eligible to compete for three new timber sales, for which the government would not consider Thomas Creek without prior payment of its outstanding Bills for Collection. Therefore, this amount, originally claimed as an offset by the plaintiff, appears to have been dropped by the plaintiff as an issue in the Butte West case. Finally, as indicated above, at the February 26, 1996 oral argument in the three above-captioned cases, plaintiff's attorney conceded all offset defenses and stated that offset was no longer relevant to this court's consideration of the matters before the court.[14]

### TIMELY PAYMENT

Plaintiff also claims, but only in its brief in the Butte West case (Case No. 94–362C), that the bill was timely and fully paid by Check No. 13233 on the Butte West Contract. The plaintiff, therefore, argues that the government is not entitled to recover interest, penalties, and administrative charges because Bill for Collection No. 180331 in the Butte West case, which only billed the principal amount, was received after the April 13, 1994 meeting. Plaintiff asserts, therefore, that Check No. 13233, dated April 25, 1994, was timely and payment in full of any amounts Thomas Creek owed on the Butte West Contract.

Plaintiff claims that because the Bill for Collection was received after the April 13, 1994 meeting, the plaintiff was led to believe that the government had changed its position as a result of that meeting. The court agrees with the defendant that this argument is "disingenuous." The principal amount due

14. See footnote 2, above.

in the Butte West Contract was originally stated in the Bill for Collection No. 182630, issued July 10, 1992. The contracting officer's January 28, 1993 decision found that plaintiff was liable for the amount billed in Bill for Collection No. 182630, plus administrative charges, interest, and penalties, accruing through the date of payment. Although on April 12, 1994, the Forest Service issued Bill for Collection No. 180331 which restated only the principal amount ($129,-190.86). Bill for Collection No. 180331 was generated automatically by the Timber Sale Statement of Account System in Kansas City, Kansas. Apparently, this bill was mistakenly generated by a clerical employee, missed in the collating process, and inadvertently mailed to Thomas Creek.

Plaintiff argues that at no time prior to its receipt of defendant's cross-motion for summary judgment in this case had Thomas Creek been informed by the Forest Service that it believed or contended that the Butte West Bill for Collection No. 180331 had been issued in error. This court cannot believe, however, that Thomas Creek, with its industry knowledge of the Forest Service's billing system, acquired as a result of its involvement in numerous timber contracts, could have believed that Bill for Collection No. 180331, which was for the principal amount only, could have operated to waive the accrual of administrative charges, interest, and penalties. Nor can the plaintiff convincingly argue that a Bill for Collection, dated April 12, 1994, received in the offices of Thomas Creek on April 13, 1994, and then faxed to and received at its attorney's offices also on April 13, 1994, while plaintiff was at the April 13, 1994 meeting, was meant as a compromise in response to that ongoing meeting. Moreover, any such notion should have been dispelled upon receipt of defendant's letter, also dated April 13, 1994, which was sent following the meeting. The letter clearly stated that the government expected payment in full of the bills related to the Butte West, Parkette 90, Flintlock, and Westrun sales and includes the following language:

As we discussed the Forest Service will consider, as a factor affecting responsibility, payment of less than the full amount owing on the Butte West, Parkette 90,

Flintlock and Westrun bills, as well as any explanation for the reduction. However, I can give no assurance that anything less than full payment of these bills will result in a CO finding of current responsibility.

This language could not have suggested to the plaintiff or to its attorney that the government had agreed to compromise any of the claims at the April 13, 1994 meeting. Therefore, the plaintiff's argument with regard to timely payment and full discharge of the debt in the Butte West case, is rejected.

### ACCORD AND SATISFACTION

Plaintiff's affirmative defense of accord and satisfaction is based on the processing and depositing by Bank of America employees of checks it tendered to the Forest Service for the principal amount only on defendant's Bills for Collection. Plaintiff argues that by placing restrictive endorsements on the checks which were processed and deposited by the Bank of America employees, the plaintiff's obligations to the defendant were discharged in full. According to the plaintiff, this defense should operate as a complete bar to defendant's claim for payment of outstanding penalty charges, administrative costs, and interest. The doctrine of "[a]ccord and satisfaction denotes 'one of the recognized methods of discharging and terminating an existing right' " as set forth in a preexisting contract; it "constitutes 'a perfect defense in an action for the enforcement of a previous claim,' " regardless of the merits of such a claim. *Chesapeake & Potomac Telephone Co. v. United States,* 228 Ct.Cl. 101, 108, 654 F.2d 711, 716 (1981) (quoting 6 Corbin on Contracts § 1276 (1962)). Defendant rejects plaintiff's position. The government argues that plaintiff's attempts to conditionally endorse the checks must fail and that the amounts owed in each of the above cases were never compromised by a government official with authority to do so.

An " 'accord' is 'an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due.' " *Chesapeake,* 228 Ct.Cl. at 108, 654 F.2d at 716 (quoting 1 Am.Jur.2d Accord

and Satisfaction § 1 (1962)); *Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 92 (1989); *Robinson Contracting Co. v. United States,* 16 Cl.Ct. 676, 685 (1989), *aff'd,* 895 F.2d 1420 (Fed.Cir.1990). Satisfaction, on the other hand, denotes " 'the execution or performance of the agreement, or the actual giving and taking of some agreed thing.' " *Chesapeake,* 228 Ct.Cl. at 108, 654 F.2d at 716 (quoting 1 Am.Jur.2d Accord and Satisfaction § 1 (1962)); *Spirit Leveling,* 19 Cl.Ct. at 92; *Robinson Contracting,* 16 Cl.Ct. at 685.

■ The legal doctrine of accord and satisfaction assumes that a bona fide dispute exists prior to discharge of the debt. Conversely, it has been stated: "[W]here the amount due was *not then in dispute,* retention or negotiation of the check for an amount less than the debt by the creditor does *not* effectuate an accord and satisfaction, regardless of any evidence that the debtor *intended* the payment as a full satisfaction." *McDonald v. United States,* 13 Cl. Ct. 255, 261 (1987) (citing *Chesapeake,* 228 Ct.Cl. at 109, 654 F.2d at 716). Moreover, to be a bona fide dispute, the dispute must have existed or been asserted prior to the time that the accord and satisfaction is claimed to have occurred. *See Edwards v. United States,* 22 Cl.Ct. 411, 422 (1991).

■ Four elements are essential to the formation of a valid accord and satisfaction in the case of a bona fide dispute: (1) proper subject matter; (2) competent parties; (3) consideration; and (4) meeting of the minds, or acceptance of payment or performance in satisfaction of a claim or demand. *Mil–Spec Contractors, Inc. v. United States,* 835 F.2d 865, 867 (Fed.Cir.1987); *Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 58–59, 343 F.2d 951, 955 (1965); *King Fisher Marine Service, Inc. v. United States,* 16 Cl.Ct. 231, 236 (1989). If the proponent of the claim fails to establish the existence of any of these basic elements, the defense fails. *Spalding and Son, Inc. v. United States,* 24 Cl.Ct. 112, 154 (1991).

■ Applying the principles of accord and satisfaction to the above-captioned cases, first, there must be proper subject matter.

In order for there to be proper subject matter under the accord and satisfaction doctrine, the subject matter of the contract must be the same as that set forth in the documents which modify or attempt to modify the contract, and provide the basis for the accord and satisfaction. *See King Fisher Marine Service Inc. v. United States,* 16 Cl.Ct. at 236.

The payment provisions of the three contracts at issue were specific. The contracts each provided the price for timber removed, as well as the interest, charges, and penalties which would accrue for failure to make timely payment for that timber. The checks offered by plaintiff, allegedly in payment of the Bills for Collection for the relevant contracts, each bore restrictive endorsements placed by the plaintiff on the back of those checks that were intended by plaintiff to operate as full payment for the relevant contract number cited on each check. The court, therefore, concludes that the subject matter element of an accord and satisfaction is satisfied.

■ The second element of accord and satisfaction is that the parties must be competent to negotiate the contract modification. In the above-captioned cases, plaintiff attempts to rely on the actions of the employees of the Bank of America, who processed the checks on which it had placed restrictive endorsement language, to argue that the government accepted payment of the lesser amounts in full satisfaction of the debts owed by plaintiff to the United States.

■ It is fundamental to the rules of government contracts, however, that to recover under a contract with the United States, a contractor plaintiff must demonstrate that the "officer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States,* 749 F.2d at 1575. Courts have consistently afforded a wide degree of latitude to contracting officers in their "authority to enter into, administer, or terminate contracts." *NKF Engineering, Inc. v. United States,* 805 F.2d 372 (Fed.Cir. 1986) (quoting the court below, *NKF Engineering, Inc. v. United States,* 9 Cl.Ct. 585,

592 (1986)). This court's predecessor, the United States Court of Claims, also has construed that authority to include the authority to modify contracts and to settle claims. *Arthur Venneri Co. v. United States,* 180 Ct.Cl. 920, 924–25, 381 F.2d 748, 750 (1967). The court in *Venneri v. United States* stated:

> Consequently, the statutory authority of the contracting officer has been construed to include the power to settle claims arising under the contract. *E.g., United States v. Corliss Steam–Engine Co.,* 91 U.S. 321, 323 [23 L.Ed. 397] (1875); *Goltra v. United States,* 119 Ct.Cl. 217, 254, 96 F.Supp. 618, 625 (1951). He also has the power to modify the contract. *Whitman v. United States,* 124 Ct.Cl. 464, 476, 110 F.Supp. 444, 450 (1953); 37 Ops. Att'y Gen. 253, 255 (1933). 'In general, an officer authorized to make a contract for the United States has the implied authority thereafter to modify the provisions of that contract particularly where it is clearly in the interest of the United States to do so.' *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 87, 98 F.Supp. 757, 766, *cert. denied,* 342 U.S. 893 [72 S.Ct. 200, 96 L.Ed. 669] (1951).

*Id.*

As is discussed above, the Forest Service had a contractual relationship with the Bank of America to process check payments and to provide lockbox processing services for the entire Forest Service, nationwide. However, the Forest Service never delegated contracting officer authority to any official or employee of the Bank of America. It also is clear that acceptance of offers to compromise contractual claims against the government prior to litigation requires delegated contracting officer authority.

 "It is well established that a purported agreement with the United States is not binding unless the other party can show that the official with whom the agreement was made had authority to bind the Government." *Mil–Spec Contractors, Inc. v. United States,* 835 F.2d at 867 (citing *S.E.R., Jobs for Progress, Inc. v. United States,* 759 F.2d 1, 4 (Fed.Cir.1985)); *H. Landau & Company v. United States,* 886 F.2d 322, 324 (Fed.Cir. 1989) (citing *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985)). Those who contract with the government bear the "risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

The United States Court of Appeals for the Federal Circuit, however, has extended actual authority to include implied actual authority, although apparent authority remains insufficient to hold the government responsible for the acts of its agents. *H. Landau & Co.,* 886 F.2d at 324. Such implied actual authority generally can be found when " 'such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.' " *Id.* (quoting J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982)); *see also United States v. Bissett–Berman Corp.,* 481 F.2d 764, 768–69 (9th Cir.1973). It has been suggested, however, that "the theory of implied actual authority is of limited application, and was not intended to repeal the long established rule that, when dealing with the government, only government agents with actual authority can make a contract, express or implied." *California Sand and Gravel Inc. v. United States,* 22 Cl.Ct. 19, 27 (1990), *aff'd* 937 F.2d 624 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1057, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992).

In *McDonald v. United States,* the court found that CAMS, the loan servicer for the defendant, Department of Housing and Urban Development (HUD), did not have the necessary authority to accept the plaintiff's lesser payment by check as payment in full of plaintiff's outstanding debt to HUD. *McDonald v. United States,* 13 Cl.Ct. at 263. This finding was based on the court's factual finding that the defendant had provided uncontroverted, "specific and credible evidence" that no such authority had been delegated to CAMS by the Secretary of HUD, and that "[o]nly HUD, not its loan servicer, had the authority to *accept* a lesser payment and discharge a borrower's debt." *Id.*

In *Kuehne & Nagel, Inc. v. United States,* Kuehne, a freight forwarder, was fined for

attempting to export spare parts without presenting an export license to the United States Customs Service. *Kuehne & Nagel, Inc. v. United States,* 17 Cl.Ct. 11 (1989). The fine consisted of forfeiture of an amount equal to 15% of the value of the shipment ($17,805), the amount that Kuehne had already posted in a letter of credit. *Id.* at 13. However, the Customs Service subsequently revised its penalty guidelines and set a maximum penalty to be imposed for technical violations at $1,000 for the first offense. *Id.* Kuehne therefore, submitted a second supplemental petition, requesting that the Customs Service compromise the earlier penalty and attached a check for $1,000 to his petition. *Id.* The check was deposited by a claims examiner at the Newark Customs office into a Department of Treasury Customs Service account. However, subsequently, Customs sent a letter to Kuehne which rejected the offer in compromise and denied the second supplemental petition. Customs later issued a draft for $17,805 against Kuehne's earlier letter of credit, which was honored by Kuehne's bank. *Id.* The court found that the customs agent who deposited the check lacked authority to do so and that no one in the Newark office had such authority. *Id.* at 17. Specifically, the court stated, "[a]bsent proof of contractual authority, Kuehne cannot hold the government liable on an accord and satisfaction contract theory." *Kuehne & Nagel,* 17 Cl.Ct. at 17.

██ In the instant cases, delegated contracting officer authority had been retained by each of the respective contracting officers during the time periods in question. During the course of the check processing procedures, none of the Bank of America employees involved in the processing of Thomas Creek's checks conferred with any Forest Service employee who possessed contracting officer authority. The respective contracting officers were not aware of the restrictive endorsements placed by plaintiff on the checks until July 27, 1994, after the checks had been processed, when Thomas Creek then wrote to the Forest Service claiming for the first time that it had discharged its obligations.

The processing of checks by Bank of America employees is a limited function which includes the following: retrieving the mail from the lockbox, opening the envelopes, extracting the checks, examining the face of the checks and bills for collection, running the physical checks through a mechanical processing machine, returning physical checks to the drawee banks, and sending copies of the checks, Bills for Collection, and "remittance advice" to the regional offices of the Forest Service. The above processing occurs in accordance with instructions provided in the Memorandum of Understanding between the Forest Service and the Bank of America.

In the relationship between the Forest Service and the Bank of America, the authority to compromise claims against the Forest Service is not an "integral part of the duties assigned" to the Bank of America employees under their Memorandum of Understanding with the government. *H. Landau & Co.,* 886 F.2d at 324. At oral argument, plaintiff conceded that the lockbox officials at the Bank of America lacked contracting officer authority.[15] Plaintiff argued, however, that regardless of the authority issue, because the contracting officer did not offer to return the money paid, the contracting officer "acquiesced" in the payment. Plaintiff, however, could not provide a legal basis to support this argument.

Based on the record presented to the court in the three above-captioned cases, this court finds that the Bank of America employees did not have either actual or implied actual authority to compromise the amount of the payments due to the government under the terms of any of the respective contracts. The court also finds that the contracting officers responsible for the contracts in each of the three above-captioned cases were unaware of plaintiff's attempts to compromise the debts defendant claimed were owed by the plaintiff. As discussed above, no employee of the Bank of America had contracting

---

15. THE COURT: You just told me you agreed that the Lockbox official or the bank official had no authority to compromise.

MR. YAZBECK: That's right, Your Honor. . . .

officer authority to negotiate a compromise, and the contracting officer was unaware of the restrictive endorsements on the checks and had not authorized a compromise of any kind.

In the cases at bar, plaintiff also appears to assert that an accord and satisfaction of its claims occurred by virtue of discussions and agreements which resulted from the April 13, 1994 meeting, as well as by the cashing of the checks in each of the three cases. After review of the record, and as is discussed below, plaintiff has failed to identify a government employee who attended the April 13, 1994 meeting with the requisite authority to compromise the claims at issue, or who in fact did so. Moreover, plaintiff has failed to prove that the Bank of America employees who handled and deposited the three checks sent in by the plaintiff had the contractual authority to compromise the government claims. In fact, the government has affirmatively shown that such authority had not been delegated.

The stipulations of fact submitted in the three cases and the other exhibits included in the Appendix do not offer a comprehensive list of who attended the April 13, 1994 meeting. It is clear from the record, however, that counsel for both Thomas Creek and the government were in attendance. No where in the documents, however, is there a reference to the presence of a contracting officer at the April 13, 1994 meeting. Thomas Creek, nonetheless, appears to allege that the relevant accord and satisfaction agreements were created by the government attorney, James Alexander.

This court has described the relationship and boundaries of authority between an attorney representing the United States and a contracting officer, as follows:

> In *Hughes Aircraft Co. v. United States,* 209 Ct.Cl. 446, 534 F.2d 889 (1976), which is binding precedent on this court, the United States Court of Claims agreed with the Government that unless otherwise provided by law, the "Attorney General is charged by statute with exclusive and plenary power to conduct all litigation to which the U.S. is a party." 209 Ct.Cl. at 465, 534 F.2d at 901. However, the *Hughes* court also held that because this power is so broadly inclusive, it must be narrowly construed. It must be limited to conduct of pending litigation against the Untied States "and does not encompass exclusive control of other *matters which, albeit related, are not yet so pending.*" 209 Ct.Cl. at 465, 534 F.2d at 901 (emphasis added). Indeed, in *Sharman [Co., Inc. v. United States,* 2 F.3d 1564 (Fed.Cir. 1993)] the Federal Circuit emphasized that, although once a claim is in litigation the contracting officer's authority to act on that claim is withdrawn, a claim is limited to each claim under the CDA for money that is part of a divisible case. *See Sharman,* 2 F.3d at 1569. Thus, under the CDA, each claim, even if part of the same case, must be considered separately by the contracting officer and a suit filed as to one claim does not divest the contracting officer of authority to consider other claims.

*Sipco Services & Marine, Inc. v. United States,* 30 Fed.Cl. 478, 485 (1994). Similarly, in *Gratkowski v. United States,* 6 Cl.Ct. 458, 461 (1984), the court wrote that neither a United States Department of Agriculture Attorney nor anyone in the General Counsel's office was delegated the authority to enter into contracts. *Id.*

Defendant also correctly points out that although attorneys in the Department of Agriculture provide legal advice to department officials with authority to contract, those attorneys do not possess independent authority to enter into or compromise claims on behalf of the United States. 7 C.F.R. § 2.31(d) reads in pertinent part:

> § 2.31 Delegation of authority to the General Counsel.
>
> The General Counsel, as the chief law officer of the Department, is legal adviser to the Secretary and other officials of the Department and responsible for providing legal services for all the activities of the Department. The delegations of authority by the Secretary of Agriculture to the General Counsel include the following:
>
> \* \* \* \* \* \*

(d) Sign releases of claims of the United States against private persons for damage to or destruction of property of the department, except those claims cognizable under the Contract Disputes Act of 1978 (41 U.S.C. 601 *et seq.*).

7 C.F.R. § 2.31(d) (1994).

Regardless, the joint stipulations submitted to the court in the above-captioned cases specifically state: "At the April 13 meeting, Thomas Creek met with government representatives. That meeting concluded with no agreement on the amounts due upon the Butte West, Westrun, or Flintlock contracts." Furthermore, in the above-captioned cases, as discussed above, the Bank of America employees also clearly lacked contractual authority. Defendant adamantly denies the existence of such authority, and plaintiff cannot cite to evidence that such authority was ever delegated. It is also a fundamental principal of government contract law that:

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.

*Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

It is clear from the record that at no time has any government employee ever indicated to Thomas Creek that the Forest Service would accept anything less than full payment of the amounts claimed in the contracting officers' decisions, in return for discharge of the debts incurred on any of the three contracts at issue here. Moreover, the Bills for Collection and correspondence received by the plaintiff after the meeting do not support the plaintiff's assertion that the Bills for Collection discussed at the meeting were compromised by the officials in attendance, even if such authority had been delegated to those in attendance at the meeting.[16] The court, therefore, concludes that the individuals identified by plaintiff, who it alleges acted on the behalf of the Forest Service to arrive at the alleged accord and satisfaction, were not competent to compromise the government's claims against the plaintiff. The second element of the rules governing accord and satisfaction, therefore, is not satisfied in the above-captioned cases.

The third element of accord and satisfaction is that there must be consideration exchanged by the parties which constitutes some payment or performance in satisfaction of a claim or demand which is a bona fide dispute. *Brock & Blevins v. United States,* 170 Ct.Cl. at 59, 343 F.2d at 955; *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d 73, 76 (10th Cir. 1949), *cert. denied,* 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950). As with any contract modification, a valid accord and satisfaction must be supported by consideration. *Brock & Blevins v. United States,* 170 Ct.Cl. at 58, 343 F.2d at 955 (1965); *Nevada Half Moon Mining Co.,* 176 F.2d at 76; *King Fisher*

---

**16.** Remarkably, the following joint stipulation, signed by both parties, appears in the record:

112. Thomas Creek requested a meeting to discuss the Butte West, Flintlock and Westrun contracting officer's decisions with the Forest Service. Department of Agriculture attorney James Alexander agreed to a meeting on April 7, 1994. The date was subsequently changed to April 13, 1994.

113. At the April 13 meeting, Thomas Creek met with Government representatives. That meeting concluded with no agreement on the amounts due upon the Butte West, Westrun, or Flintlock contracts. Thomas Creek subsequently received a bill for collection on the Butte West contract, for the principal amount only. The Butte West bill for collection was *not* issued after the meeting on April 13, 1994, but, rather, was automatically and incorrectly issued during the course of a routine billing cycle on the day *before* the meeting, or on April 12, 1994. Walker Decl.Ex. 4. The Butte West bill was received by Thomas Creek at its office while Thomas Creek was at the April 13th meeting where no agreement was reached, and the bill was telecopied by Thomas Creek to its lawyers later on that very day. Walker Decl.Ex. 4. After it received the bill on April 13, 1994, Thomas Creek's lawyer received a letter from a Forest Service attorney which stated that the Forest Service did not view any offer as having been made by Thomas Creek, or accepted by the Government. Supp. App. 1, 2. The Butte West bill, dated April 12, 1994, could not have led Thomas Creek to believe that the Government had changed its position as a result of the meeting on April 13, 1994.

*Marine Service v. United States,* 16 Cl.Ct. at 236. *See also Montefiore Hosp. Ass'n of Western Pennsylvania v. United States,* 5 Cl.Ct. 471, 476 (1984) (citing *Vulcanite Portland Cement Co. v. United States,* 74 Ct.Cl. 692, 705, 1931 WL 2351 (1931)).

▪▪▪ Defendant argues that Thomas Creek gave nothing in exchange for the discharge of its debts. In its argument, defendant relies on an Eighth Circuit case, *Occidental Life Insurance Co. v. Eiler,* 125 F.2d 229, 235 (8th Cir.), *reh'g denied,* 126 F.2d 429 (8th Cir.1942), *cert. denied,* 316 U.S. 688, 62 S.Ct. 1278, 86 L.Ed. 1760 (1942), for the proposition that "a mere payment of a portion of the amount that Thomas Creek indisputably owes cannot constitute the required consideration" for release of the balance of the debt. This court believes defendant's analysis to be too simplistic. The doctrine of accord and satisfaction is not only applicable in the case of partial payments of debt, but is also applicable to modifications of contracts. A contracting officer has authority to modify a contract if he or she believes such modification is in the best interest of the government for a variety of reasons, perhaps even just to ensure contract completion or collection of monies due. *See Venneri v. United States,* 180 Ct.Cl. 920, 924–25, 381 F.2d 748 (1967); *Fred A. Arnold, Inc. v. United States,* 18 Cl.Ct. 1, 5 (1989).

The United States Court of Claims, a predecessor court to this court, previously acknowledged that a partial payment may be sufficient consideration for accord and satisfaction. In *Chesapeake & Potomac Telephone Co. v. United States,* the court wrote:

> It is evident from the foregoing that merely giving a check for less than the amount claimed is not sufficient to create an accord and satisfaction. There must also be accompanying expressions clearly indicating the debtor's intention that the cashing of the check is to operate as a settlement in full. This is precisely what is lacking here.

*Chesapeake & Potomac Telephone,* 228 Ct.Cl. at 110, 654 F.2d at 716–17. Although the consideration element of the accord and satisfaction doctrine might be met under a contract modification theory, in the instant

cases, there was no meeting of the minds or acceptance of any consideration. Therefore, this element of accord and satisfaction was not met.

▪ The fourth element of the doctrine of accord and satisfaction, as in the case of any contract formation or contract modification, is that there must be a meeting of the minds. *Texas Instruments Inc. v. United States,* 922 F.2d 810, 815 (Fed.Cir.1990); *King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. 231, 236–37 (1989). Otherwise stated there must be acceptance of payment or performance in satisfaction of a claim or demand. In this regard, the United States Court of Claims held:

> 'In order that a performance rendered by an obligor shall operate as a satisfaction of the claim against him, it must be offered as such to the creditor.' *Id.* [6 Corbin on Contracts § 1277.]

> *There must be accompanying expressions sufficient to make the creditor understand or to make it unreasonable for him not to understand, that the performance is offered to him as a full satisfaction of this claim and not otherwise. If not so rendered, there is no accord, either executory or executed, for the reason that there are no operative expressions of agreement—no sufficient offer and acceptance.*

> *Id.* (emphasis supplied).

*Chesapeake & Potomac Telephone Co. v. United States,* 228 Ct.Cl. at 109, 654 F.2d at 716. Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances. *Texas Instruments v. United States,* 922 F.2d at 815.

In *S.E.R., Jobs for Progress v. United States,* the United States Court of Appeals for the Federal Circuit held that, at best, negotiations took place but that no meeting of the minds had taken place. In the *S.E.R.* case, the company comptroller sent two cashier's checks for payment to a Mr. Gibson at the Department of Labor with an enclosed letter, stating that the enclosed refund of $7,060.13 " 'should hopefully reflect all the necessary changes to close-out this contract

and to reflect those reimbursements to DOL [Department of Labor] that we have agreed upon during our meetings.'" *S.E.R., Jobs for Progress v. United States,* 759 F.2d at 4. The court held that "[s]uch evidence, even when combined with the acceptance of the payment by DOL and its long silence thereafter must be deemed insufficient to establish that a settlement or an accord and satisfaction of the claim took place." *Id.* Moreover, the court found that the record lacked any indication of Mr. Gibson's capacity at the DOL, or that he had contracting officer authority and, therefore, authority to settle the agency's claims.

In *Chesapeake & Potomac Telephone Co. v. United States,* the court noted:

> Where the amount due is in dispute, and the debtor sends cash or check for less than the amount claimed, *clearly expressing his intention that it is sent as a settlement in full* and not on account or in part payment, the retention and use of the money or the cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction, even though the creditor may assert or send word to the debtor that the sum is received only in part payment.

*Id.* at 109, 654 F.2d at 716, (quoting 6 COR-BIN ON CONTRACTS § 1279 (1962)) (emphasis in cited case not in original). The court in *Chesapeake,* however, went on to note that, "'[t]he mere fact that the creditor receives a check ... from his debtor for less than the amount which the creditor claims, with knowledge that the debtor claims to be indebted to him only in amount paid, does not result in an accord and satisfaction.'" *Id.* (citing to 1 AM.JUR.2d *Accord and Satisfaction* § 15 (1962)). "'[T]he debtor must also indicate that payment is offered upon condition that it be accepted in full satisfaction *or not at all,* or the circumstances must be such as to clearly indicate to the creditor that it was sent with that intention.'" *Id.* (emphasis added).

In the above-captioned cases, plaintiff sent checks which it claimed were in full satisfaction of its debt in each of the contracts at issue. The plaintiff placed the restrictive endorsements on each of the checks it sent. On check No. 13233 for the Butte West Contract the endorsement, written by the plaintiff on the back of the check, read: "PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 1-28-93 CDA # 6-93-3, CONTRACT # 091433." The restrictive endorsement placed on the back of Check No. 13404 by the plaintiff in the Flintlock Contract read: "THIS IS FULL AND FINAL PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 2/22/94 CDA # 6-94-d, CONTRACT # 076685." The restrictive endorsement placed by the plaintiff on the back of Check No. 13407 for the Westrun Contract read: "THIS IS FULL AND FINAL PAYMENT FOR ALL AMOUNTS OWED PURSUANT TO COD DATED 2/22/94 CDA # 6-94-c, CONTRACT # 077329." None of the above endorsements indicated that the Forest Service should decline the check if not in agreement with the restrictive endorsement. Although cashing of a check or use of money can be taken as acceptance, there can be no acceptance when there was no "meeting of minds." Furthermore, there can be no meeting of the minds when the entity or individual cashing the check is not authorized to compromise a debt, as was true in the instant cases.

Thomas Creek also claims that although no formal agreement had been reached, plaintiff had informed the Forest Service's authorized representatives that it would wait to receive a Bill for Collection before bringing a challenge in court. Therefore, Thomas Creek claims that when it received the Bill for Collection in the Butte West case on April 13, 1994, which addressed only the principal amount owed, and which did not include interest, administrative charges, or penalties, plaintiff understood it to be acceptance of its offer to pay the outstanding principal on all three contracts.

Plaintiff's unpersuasive briefing on this issue is not based on legal authority, stretches the factual chronology, and, especially for an experienced contractor, is not credible. It is worthy of quotation in full:

**B. ACTION BY GOVERNMENT OFFICIALS TO COMPROMISE THE CLAIMS.**

The Forest Service contends that there was no action by a government official with authority to compromise the claims. This is not, in fact, the case.

As the facts demonstrate, a meeting was held on April 13, 1994, between Thomas Creek, its counsel, Mr. James Alexander, General Counsel for the U.S. Department of Agriculture and Forest Service representatives. The individuals in attendance at this meeting had the necessary authority to "compromise" the claims being asserted against Thomas Creek. Unlike the cases cited by the Forest Service, here, the Forest Service's General Counsel, with whom Thomas Creek has dealt in settlement of other disputes, was in attendance.

During the meeting, Thomas Creek indicated that it would pay what it felt was owed, and that amount was the principal only. Thomas Creek did not feel obligated to pay the administrative charges, interest or penalties, when such amounts arose solely as a result of Thomas Creek's lawful exercise of its rights of offset. Walker Declaration, ¶ 10.

At the conclusion of the meeting, no formal agreement had been reached and Thomas Creek told the Forest Service's authorized representatives that it would wait to receive a Bill for Collection, before challenging in court the amount of the bill. Thereafter, Thomas Creek received a Bill for Collection on the Butte West contract, which claimed only for the principal amount owed, with no claim for interest or penalties. Since this was the position taken by Thomas Creek, it understood and believed that its offer of settlement had been accepted by the Forest Service. As a result, it sent payment of the principal amounts allegedly owed on the Westrun, Flintlock and Butte West contracts.

Despite the Forest Service's contentions that Thomas Creek's actions were surreptitious, it is clear, that based upon the April 13, 1994 settlement meeting and its subsequent receipt of the Bill for Collection which sought only to collect the principal sum of the Butte West Contracting Officer's Decision, Thomas Creek believed that the Forest Service had accepted its settlement offer to pay the principal balance on each of the contracts.

Even the joint stipulation of facts submitted by both parties in the above-captioned cases contradict the factual statements made in plaintiff's brief, and state as follows:

80. During the course of the check processing procedures undertaken for the Forest Service, none of the individuals involved in the processing of Thomas Creek's check conferred with any Forest Service employee who possessed contracting officer authority. Fong Decl. ¶ 28, 31, App. 7, 8; Young Decl. ¶ 10, App. 11. None of those individuals themselves possessed contracting officer authority. Fong Decl ¶ 31, App. 8.

81. At a meeting on April 13, 1994, Thomas Creek met with Government representatives. That meeting concluded with no agreement on the amounts due upon the Butte West, Westrun, or Flintlock contracts. Thomas Creek subsequently received a Bill for Collection on the Butte West contract for the principal amount only. The Butte West Bill for Collection was *not* issued after the meeting on April 13, 1994, but, rather, was automatically and incorrectly issued during the course of a routine billing cycle on the day *before* the meeting, or on April 12, 1994. Walker Decl.Ex. 4. The Butte West bill was received by Thomas Creek at its office while Thomas Creek was at the April 13th meeting where no agreement was reached, and the bill was telecopied by Thomas Creek to its lawyers later on that very day. Walker Decl.Ex. 4. After it received the bill on April 13, 1994, Thomas Creek's lawyer received a letter from a Forest Service attorney which stated that the Forest Service did not view any offer as having been made by Thomas Creek, or accepted by the Government.[5] Supp.App. 1, 2.[6]

82. At no time has any Government employee ever indicated to Thomas Creek in any way that the Forest Service would accept anything less than full payment of the amounts claimed in the contracting officer's decision, in return for discharge of

those debts. Fong Decl. ¶¶ 28, 31, 32, App. 7, 8; Supp.App. 2, 5.

\* \* \* \* \* \*

[5] The Forest Service concludes that the Butte West bill, dated April 12, 1994, could not have led Thomas Creek to believe that the Government had changed its position as a result of the meeting on April 13, 1994. Thomas Creek contends that the Forest Service's conclusion upon this point is opinion and not fact.

[6] "Supp.App.____" in this section of the stipulation refers to the supplemental appendix, attached to defendant's reply brief in No. 94-544C.

Although footnote 5 to the above quoted stipulations of facts maintain that paragraph 81 of the Stipulations of Fact is solely an opinion of the Forest Service, the documents in the record fully support the government's position. The Bill for Collection in the Butte West case, on which plaintiff's whole argument is based, was dated "APR 12, 1994." Moreover, it was first received at Thomas Creek's offices on April 13, 1994, while the meeting on April 13, 1994 was in progress. Thus, it is impossible for the Butte West Bill for Collection in question to reflect any agreements achieved at the April 13, 1994 meeting, and could not have led Thomas Creek to believe that it was an acceptance of its offer to pay only the principal due on the contract in accord and satisfaction of all the monies owed to the government, including interest, administrative charges, and penalties. In addition, no similar Bills for Collection for principal only were received for either the Westrun or the Flintlock Contracts. Therefore, it is even less likely that Thomas Creek could have presumed that the April 12, 1994 Butte West Bill for Collection created an acceptance of its offer to pay only the principal amount due on the Westrun and Flintlock Contracts. Furthermore, Thomas Creek acknowledged in the Stipulation of Facts that no agreement had been reached at the April 13, 1994 meeting and that Thomas Creek's lawyer received a letter from a Forest service attorney, dated April 13, 1994, which stated that the Forest Service did not view any offer as having been made by Thomas Creek, or accepted by the government.

The court agrees with the defendant that Thomas Creek's allegations that it could dis-charge its debts to the government by unilaterally placing a restriction on the back of the checks submitted to a government collection agent must be rejected. The government's analogy to taxpayers who might "scrawl a condition upon the back of a check" and thereby "avoid the bulk of his or his tax liability" raises the proper specter of the absurdity of plaintiff's position. Therefore, this court finds that the element of the accord and satisfaction doctrine, that there be a "meeting of minds," or acceptance of payment or performance in satisfaction of a claim or demand, has not been met.

### OREGON REVISED STATUTE § 73.0311

Plaintiff also claims that the debt under each of the three contracts was discharged because it allegedly complied with ORS § 73.0311. That statute provides, in relevant part:

> **73.0311 Accord and satisfaction by use of instrument.** (1) If a person against whom a claim is asserted proves that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, the amount of the claim was unliquidated or subject to a bona fide dispute, and the claimant obtained payment of the instrument, the following subsections apply.

> (2) Unless subsection (3) of this section applies, the claim is discharged if the person against whom the claims asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

> (3) Subject to subsection (4) of this section, a claim is not discharged under subsection (2) of this section if either of the following applies:

> (a) The claimant, if an organization proves that:

> (A) Within a reasonable time before the tender, the claimant sent a conspicuous statement to the person against whom the claim is asserted that communications concerning disputed debts, including an instrument tendered as full satisfaction of a

debt, are to be sent to a designated person, office or place; and

(B) The instrument or accompanying communication was not received by that designated person, office or place; or

(b) The claimant, whether or not an organization, proves that within 90 days after payment of the instrument, the claimant tendered repayment of the amount of the instrument to the person against whom the claim is asserted. This paragraph does not apply if the claimant is an organization that sent a statement complying with paragraph (a)(A) of this subsection.

(4) A claim is discharged if the person against whom the claim is asserted proves that, within a reasonable time before collection of the instrument was initiated, the claimant, or an agent of the claimant having direct responsibility with respect to the disputed obligation, knew that the instrument was tendered in full satisfaction of the claim.

■ At oral argument, plaintiff conceded that there was no binding authority to direct this court to apply Oregon's version of the Uniform Commercial Code (UCC) in the instant cases, nor was there any indication in the contracts at issue that the UCC or the Oregon statute should apply. Furthermore, the plaintiff conceded at oral argument that he could find no case law to indicate that the UCC should be applied in the instant cases. In fact, to the contrary, "[F]ederal common law, not state-adopted UCC ... governs questions of 'the rights of the United States arising under nationwide federal programs.'" *McDonald v. United States*, 13 Cl.Ct. at 260 (citing *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979)); *see also Marine Midland Bank v. United States*, 231 Ct.Cl. 496, 509–510, 687 F.2d 395 (1982), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983); *Kuehne & Nagel*, 17 Cl.Ct. 11, 18 n. 5 (1989). Therefore, because federal common law controls, ORS 73.0311 does not provide any relief to the plaintiff.

### *RESALE DAMAGES*

The motions for summary judgment of both parties discuss one issue which is unique to the Butte West Contract (Case No. 94–362C). Defendant moves for summary judgment on the issue of resale damages in the Butte West case, its first counterclaim, and plaintiff opposes the motion. The Butte West Contract, like most Forest Service contracts, contained Clause C9.4, "Failure to Cut," which is quoted above, and which determines the methodology for the computation of damages in the event that Thomas Creek failed to perform. In the case of the Butte West Contract, the Forest Service had notified Thomas Creek that it had breached the contract by failing to pay Bill for Collection No. 182428 and suspended the contractor's performance. Thomas Creek's operations remained suspended through the contract termination date. As stated by the United States Court of Appeals for the Federal Circuit: "A long line of our precedent has established that agreed-upon contract terms must be enforced." *Madigan v. Hobin Lumber Co.*, 986 F.2d 1401, 1403–04 (Fed.Cir.1993); *Hoskins Lumber Co. v. United States*, 20 F.3d 1144, 1148 (Fed.Cir.1994); *Engle Investors v. United States*, 21 Cl.Ct. 543, 549 (1989).

■ At the same time, the government, when enforcing a damages clause, has a duty to mitigate such damages when a contractor breaches the contract between the parties. *Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990) (citing *Churchill Chemical Corp. v. United States*, 221 Ct.Cl. 284, 288, 602 F.2d 358, 361 (1979)); *Engle Investors v. United States*, 21 Cl.Ct. at 549. The government cannot charge the contractor for damages which could have been avoided by the government "with reasonable effort and without undue risk or expense." *Ketchikan Pulp v. United States*, 20 Cl.Ct. at 166; *Engle Investors v. United States*, 21 Cl.Ct. at 549. Extraordinary efforts, however, "to ferret out the single best situation which will absolutely minimize the breaching party's damages" is not required of the government. *Ketchikan Pulp v. United States*, 20 Cl.Ct. at 166.

■ "[T]he Forest Service is given broad discretion in the reprocurement (resale) process." *Engle Investors v. United States*, 21

Cl.Ct. at 552 (citing *Astro–Space Lab, Inc. v. United States*, 200 Ct.Cl. 282, 308, 470 F.2d 1003, 1017 (1972)). That discretion, however, must not be abused. *Id.* "The test is whether, under all the circumstances, the Forest Service acted reasonably...." *Engle Investors v. United States*, 21 Cl.Ct. at 552. The government is only required to "act reasonably and promptly given the circumstances." *Ketchikan Pulp v. United States*, 20 Cl.Ct. at 166. "So long as the government acts reasonably, the defaulting contractor bears the risk of the changing market during a reasonable interval for reletting the contract." *Ketchikan Pulp v. United States*, 20 Cl.Ct. at 166. However, "[r]easonableness is a question of fact." *Engle Investors v. United States*, 21 Cl.Ct. at 550.

■ "The defaulting contractor bears the burden of showing that the government could have mitigated its losses through reasonable effort and expense." *Ketchikan Pulp v. United States*, 20 Cl.Ct. at 166; *see Engle Investors v. United States*, 21 Cl.Ct. at 552. The burden of showing mitigation has occurred shifts to the government "[i]f the contractor establishes a *prima facie* case ..." of unreasonableness. *Ketchikan Pulp v. United States*, 20 Cl.Ct. at 166 (emphasis in original) (citing *Forest Environmental Services Co. v. United States*, 5 Cl.Ct. 774, 780 (1984)); *Engle Investors v. United States*, 21 Cl.Ct. at 552 n. 14. "[W]hile it is always difficult to the define the term, it is clear that the 'reasonableness' of any action must be judged by the facts and circumstances at the time the action is taken." *Ketchikan Pulp v. United States*, 20 Cl.Ct. at 166 (citing to *Toyota Indus. Trucks U.S.A., Inc. v. Citizens National Bank of Evans City*, 611 F.2d 465, 471 (3rd Cir.1979)).

■ If the terms of the defaulted contract and the resale contract are the same, the resale contract should be "assumed to be reasonable absent any contrary evidence." *Engle Investors*, 21 Cl.Ct. at 550. In *Engle Investors v. United States,* the court determined that: "in light of the additional conditions in the resale contract, the court cannot say, without a trial, that these conditions did not affect the price significantly." *Id.* In the instant case, therefore, the presumption of reasonableness does not apply. The resale contract was not sold on exactly the same terms as the original contract because it did not include a price escalation provision. According to the contracting officer, a stumpage rate adjustment provision could not be included in the resale contract because the term of the contract was less than one year.

■ Although plaintiff does not contest the validity of section C9.4, and recognizes the line of cases which have upheld assessment of resale damages, plaintiff argues that the government acted unreasonably during the resale process. Plaintiff states:

> The Forest Service (1) failed to timely and properly appraise the remaining included timber and thereby failed to properly set the minimum resale bids for the timber; (2) failed to timely resell the remaining timber; (3) resold the timber in the late fall when harvest operations could be suspended as a result of adverse weather; (4) failed to provide sufficient contract time within which to harvest the remaining timber; and (5) failed to include a Stumpage Rate Adjustment clause within the resale contract.

Plaintiff alleges that the unreasonable nature of defendant's actions is demonstrated by a number of actions on the part of the Forest Service. Among the grounds which plaintiff urges documents the defendant's unreasonable actions is the setting by the government of the minimum weighted average bid at $564.89/MBF. Plaintiff argues this resulted in only one bidder attending the sale, at an "artificially low resale price for the remaining timber." The submitted weighted average bid was $565.00/MBF.

Plaintiff also claims that the remaining salvage timber included in the Butte West Contract was not promptly offered for resale, despite the Forest Service's earlier representations that it would be sold within five (5) months of the expiration of the contract. The Butte West Contract expired on November 30, 1992. The resale occurred on October 7, 1993. The Forest Service's manual requires the prompt sale of timber remaining uncut after the expiration of an uncompleted contract, unless there is an overriding reason

not to reoffer promptly. Forest Service Manual § 2433.53; *see also Ketchikan Pulp,* 20 Cl.Ct. at 166. In *Forest Environmental Services Co. v. United States,* the court held, however, that "[t]he mere passage of time alone does not mean that the government failed in its duty to mitigate damages. Plaintiff must show that it was prejudiced in some substantial way by the delay." *Forest Environmental Services Co. v. United States,* 5 Cl.Ct. 774, 780 (1984); *see also Ketchikan Pulp,* 20 Cl.Ct. at 166.

On May 29, 1992, the Forest Service notified Thomas Creek that it had breached the Butte West Contract and that plaintiff's contract performance on the Butte West Contract was suspended for Thomas Creek's failure to pay Bill for Collection No. 182428. Thomas Creek's operations remained suspended through the contract termination date because plaintiff failed to rectify its account with the Forest Service. The contract term expired on November 31, 1992, at which time Thomas Creek's Butte West Contract work remained uncompleted and the Bill for Collection remained unpaid. On January 28, 1993, the contracting officer issued a decision regarding Thomas Creek's failure to pay the Bill for Collection, but reserved the right to issue a later decision regarding the resale damages. Seasonal weather conditions, however, precluded access to the contract area and no resale could occur immediately. The contracting officer, therefore, postponed making the resale damages determination. The January 28, 1993 decision informed Thomas Creek that the resale damage determination would be made in "approximately April 1993." In fact, the contract for the remaining uncut timber was resold on October 7, 1993; and the contracting officer decision regarding resale damages was issued on December 7, 1993.

Plaintiff specifically cites the change in market prices between the date that the Forest Service set minimum bid prices for the resale in July 1993, and the date that the timber was resold in October 1993 as having prejudiced Thomas Creek. Plaintiff claims that the Forest Service reappraised another of Thomas Creek's timber sales, on or about September 1993, in the same national forest, on the same size contract, and with the same species mix, within thirty (30) days of the Butte West resale, but used substantially different prices. Plaintiff claims that the six (6) months delay from April 1993 to October 1993 allowed the timber, which was already designated as salvage, blown down, dead and dying, to decay further and, therefore, that the number of bidders and the price on resale was substantially reduced. Plaintiff also claims that because the resale occurred on October 7, 1993, and the normal operating season for this particular sale was June 1 through November 30, only fifty-four (54) days were allowed for the purchaser to complete its harvest of the remaining timber by November 30, 1993, which placed an unreasonable restriction on the contract and reduced the sale price. Further, plaintiff argues that defendant's announcement that the roads to be used to harvest the resale timber were of limited strength, and that repairs to the roads would be at the resale contractor's expense, also reduced the price of the resale timber. Finally, plaintiff claims that prejudice occurred because the Forest Service did not include a Stumpage Rate Adjustment clause in the resale contract, which removes much of the risk to the purchaser for timber market fluctuations, even though such a clause had been included in the original contract.

Although defendant attempts to address each of the issues raised by plaintiff on the resale which occurred in the Butte West Contract in its responsive filings, this court finds that plaintiff has raised genuine issues of fact regarding the reasonableness of defendant's actions during the resale process. The joint stipulations of fact submitted in the above-captioned cases are far less complete on the resale issue than regarding other issues of facts submitted in the above-captioned cases. In stipulation 15, the parties do agree that: "[s]easonal weather changes precluded access to the contract area and no resale could occur immediately." In stipulation 20, "a stumpage rate adjustment (*i.e.,* price adjustment) provision could not be included in the resale contract because the term of the contract was less than one year." There is insufficient information in the record, however, to allow the court to conclude

whether or not the delay was reasonable. Moreover, the court also rejects the defendant's argument that the propriety of the resale can be determined purely as a legal matter on the basis of contract provision C9.4, or, that to the extent that factual disputes exist, the May 15, 1995 declaration of William Bramwell establishes an undisputed pattern of material facts. Consequently, this court concludes that summary judgment is not appropriate at this time on the issue of the resale damages in the Butte West Contract (Case No. 94–362C). The defendant's motion for summary judgment on the Butte West resale contract is, therefore, denied. The issues raised by the resale in the Butte West case must be determined in further proceedings before the court.

### CONCLUSION

After a careful review of the record before this court and the applicable law, the court finds the following:

In the Butte West Contract (Case No. 94–362C), the court **GRANTS** defendant's motion for summary judgment on its second counterclaim. The court **DENIES** the defendant's cross-motion for summary judgment on defendant's first counterclaim regarding resale damages and directs the parties to the separate scheduling order to be filed by the court regarding future proceedings.

In the Flintlock Contract (Case No. 94–545C), the court **GRANTS** defendant's motion for summary judgment on the defendant's counterclaim. The court **DENIES** the plaintiff's cross-motion for summary judgment on the counterclaim. Case No. 94–545C is, hereby, **DISMISSED.**

In the Westrun Contract (Case No. 94–544C), the court **GRANTS** defendant's motion for summary judgment on the defendant's counterclaim. The court **DENIES** the plaintiff's cross-motion for summary judgment on the counterclaim. Case No. 94–544C is, hereby, **DISMISSED.**

### COSTS

In the Flintlock (Case No. 94–545C) and the Westrun (Case No. 94–544C) cases, the defendant has moved for the assessment of costs against Thomas Creek, pursuant to RCFC 54(d). RCFC 54(d) states:

> **(d) Costs.** Except when express provision therefore is made either in a statute of the United States or in these rules, costs shall be allowed as a matter of course to the prevailing party in any action not dismissed for lack of subject matter jurisdiction, unless the court otherwise directs; but costs against the United States shall be imposed only to the extent permitted by law. See Rule 77.4.

Given dismissal by this court of the Flintlock and Westrun case, the issue of costs is ripe, and the court awards costs to the defendant. The court notes that the issue of costs in the Butte West case is deferred until resolution of the merits of the resale issue raised in that case has occurred.

**IT IS SO ORDERED**